IN THE SUPREME COURT OF NORTH CAROLINA

No. 606A05-3

Filed 2 March 2018

STATE OF NORTH CAROLINA

v.

ERIC GLENN LANE

Appeal pursuant to N.C.G.S. § 15A-270.1 from an order entered on 18 August 2015 by Judge Arnold O. Jones, II in Superior Court, Wayne County.    Heard in the Supreme Court on 11 December 2017.

*Joshua H. Stein, Attorney General, by Nicholaos G. Vlahos, Assistant Attorney General, for the State.*

*Glenn Gerding, Appellate Defender, by Daniel Shatz, Assistant Appellate Defender, for defendant-appellant.*

BEASLEY, Justice.

In this appeal we consider the materiality of postconviction DNA testing of hair samples in a capital case.  In denying defendant's motion for postconviction DNA testing, the trial court found that defendant failed to show the requested testing was material to his defense—specifically, that there was no reasonable probability that the verdict would have been more favorable to defendant if the testing had been conducted.  We agree and hold defendant has failed to prove the materiality of his request.

On 7 April 2003, defendant was indicted in Wayne County for first-degree murder, first-degree statutory rape, first-degree statutory sex offense, indecent liberties with a minor, lewd and lascivious conduct, and first-degree kidnapping of five-year old "P.W."[1] Defendant was tried capitally in Wayne County, and his first trial in the fall of 2004 ended in a mistrial due to juror misconduct. Defendant's second trial commenced on 1 June 2005.

The evidence at trial[2] tended to show that at approximately 4:45 p.m. on Friday, 17 May 2002, P.W. was playing at her friend Michael's house and riding a red and white bicycle up and down his driveway. The two children saw defendant in his nearby yard and went over to play on his swing set. At one point, the children went inside defendant's house to look at his goldfish and eels and then eventually returned to Michael's house. Around 6:30 p.m., Michael's mother told P.W. that she needed to go home because Michael and his family were leaving for the evening. P.W. left on the red and white bicycle.

When it was time for her dinner, P.W. could not be found at Michael's house or in the neighborhood. P.W.'s family repeatedly searched the neighborhood to no avail

---

[1] Pursuant to North Carolina Rules of Appellate Procedure 4(e), the decedent's initials are used to protect her identity.

[2] A more detailed version of the procedural history and the evidence presented at trial in this case can be found in *State v. Lane*, 365 N.C. 7, 707 S.E.2d 210 (2011); here we recite an abbreviated version of the procedural history and facts of the case with emphasis on that which is necessary for analysis of defendant's materiality argument.

and called law enforcement the next morning. After commencing a general search for P.W. and questioning several people, including defendant, law enforcement agencies were unable to find P.W. Defendant's home and property were searched multiple times with his consent, and his story about his interactions with P.W. remained consistent throughout the weekend despite multiple interviews: namely, P.W. and Michael had been at defendant's house for about ten minutes on Friday afternoon to play on his swing set and the children came inside briefly to view his goldfish and eels.

During the early afternoon of Sunday, 19 May 2002, local residents discovered P.W.'s body while they were fishing in a nearby creek. Her upper body was wrapped in a trash bag; her legs were pulled up to her chest with duct tape, and her face and hair were not visible due to the duct tape wrapped around her head. The crotch of her shorts and panties had been jaggedly cut, and that area was bloody and red. An autopsy later showed that P.W. had suffered some blunt force trauma, had several bruises and lacerations, and had sustained a sexual assault. The official cause of P.W.'s death was "asphyxia secondary to suffocation," and the medical examiner concluded that P.W. had been alive when she was put into the trash bag. She died in part because she vomited while struggling against the duct tape and breathed some of the vomit into her lungs. A red and white bicycle, identified as the one P.W. had been riding on Friday evening, was also discovered in the creek. A blue tarp rolled up with duct tape at one end was found in a nearby ditch.

Several witnesses reported they had seen a white male on a red scooter or moped between 7:15 and 7:45 p.m. on Friday night near the bridge that crossed the creek where P.W.'s body was discovered. The witnesses described the scooter as having a black basket and reported that the rider wore a light or white helmet. The witnesses also reported seeing the man struggle with both a large bundle wrapped in a blue tarp and a small red and white bicycle. Based on this information and their knowledge that defendant had a red scooter, law enforcement returned to defendant's house. Defendant consented to another search of his residence and the storage sheds on his property, where law enforcement found a red scooter with a black basket, a white helmet, rolls of duct tape and electrical tape with blue fibers consistent with the tarp found near where P.W.'s body was discovered, and trash bags similar to the one wrapped around P.W.'s upper body. Again, defendant repeated that he had not seen P.W. after she left his house with Michael on Friday afternoon, and his story remained consistent with previous interviews.

But on 21 May 2002, defendant made a confession, first orally and then reduced to writing, which he corrected and signed:

> I, Eric Lane, came home from work on Friday, May 17, 2002, at about 3:00 p.m. or 3:30 p.m. I . . . started drinking beer. Michael . . . and [P.W.] . . . came over to my house at about ten or 15 minutes after I got home. I had drank about three beers before they got there. They [ ] were riding bicycles. I was lying in the backyard in front of the swing. They asked if they could swing. I said yes. They asked me to push them on the swing so I did. . . . [P.W.] asked for something to drink. I went in the house and got

some—got them some Pepsi. They came to the door and [P.W.] stepped in the house. . . . I told them to go look at the eels which were in the living room. They then went to [my son's] room to look at the goldfish. They stayed in the house about ten minutes. They then went back outside and played on the swing again. I went back out with them.

. . . .

After about five minutes . . . [they] left. . . .

. . . I was still drinking. About 15 minutes later, [P.W.] came back to the house riding a white and red bicycle. She asked if she could look at the eels again so we went in the house. At first I sat at the kitchen table while [P.W.] played with [my son's] toys in his room. She played in his room for ten or 15 minutes. I was still drinking beer.

I got up and started feeding the eels and she came into the living room with me. She was wearing jean shorts/skirt. I don't remember what color her shirt was. She was wearing white tennis shoes. I think I was wearing tan shorts. I wasn't wearing a shirt. I was wearing my white cap with "USA" and American flag on it.

I started playing with her, tickling her. She fell on the floor laughing. We were both [on] the floor playing. The next thing I remember I woke up on top of her. I pushed myself up with my hand which was on her shoulder. She was unconscious. My shorts were down as well as my underwear. I pulled up her shorts and maybe her panties. They were not all the way down. I shook her trying to get her to wake up. I had my hands on her shoulders while shaking her.

I started to walk around the house and tried to figure out what happened. . . . I then walked outside where I saw her bicycle. I put it in the white building. I walked around the building for ten or 15 minutes trying to figure out what to do. I knew I had to get her out so I grabbed a blue tarp in the white building and got a roll of duct tape

out of the other building. I grabbed the trash bag out of the trash can because it was the only one I had. It was white with red handles. I wrapped her in the trash bag and then taped the bag around her. I put the tarp around her and wrapped her in the tarp. I taped the tarp around her. I drank for a minute. I got her and a couple of beers and went to the white building. I put her in the middle of my scooter where you put your feet. My scooter is red. . . . I hung the bicycle on the scooter basket. I then left on the scooter.

I went to the creek. [Defendant described the route he took]. . . . I got to [the] creek, parked the scooter and got [P.W.] and the bicycle off the scooter. The tarp came off of her when I was getting her off. I don't know what time it was but it was getting dark.

A car came so I ran and threw the bicycle in the creek and [hid] under the bridge. I sat there and drank the two beers I had and threw the bottles in the creek. I laid the body at the edge of the water under the bridge where someone could find it.

I grabbed the tarp and went to the scooter. I took the same path back home. The tarp blew off on the way back. I didn't stop to get it. I just went home.

. . . I guess I raped her, too, but I don't remember.

I was wearing a white helmet when I took [P.W.] to the creek.

When I pulled out of my driveway, the body almost fell off the scooter. I stopped and pulled her back onto the scooter. . . . I was wearing a red pullover shirt and a blue jacket and tan shorts. The deputies have all the clothing that I was wearing except for the red shirt, which is still at the house. There was no blood on the floor of my house. I remember seeing a black SUV at the end of my driveway when I stopped to pull the tarp back on the scooter.

> I remember that when [P.W.] and I were in the living room, I started tickling her and we both were on the floor. I tickled her between her legs and her private parts area. Her pants came down. Somehow my pant[s] came down also. I don't remember actually having sex with her but I'm pretty sure I did. I don't remember looking for signs that we had sex. I thought she was dead when I put the trash bag over her. She never moved so I thought I had suffocated her with my body or her neck twisted and she died.

During the interview, defendant expressed shame and remorse by making statements such as: "I'm sick. I'm a sick person. I wish I was dead," and "I'm a rapist and a killer. I wish I was dead." Defendant subsequently gave a second statement utilizing the same timeline and details, saying he "d[id] not remember but if the girl was sexually molested then I must have did [sic] it" and recounting how he wrapped P.W.'s body in a tarp and disposed of her at the creek. Based on his confession, defendant was arrested and deputies returned to his home to conduct another search. They recovered the shirt and shoes defendant said he had been wearing the day P.W. died, as well as a piece of defendant's living room carpet.

The State presented forensic evidence at trial. The trash bag in which P.W. was found was determined to be consistent with others taken from defendant's home. Blue fibers found on defendant's gloves and clothes, scooter, a roll of duct tape taken from defendant's home, P.W.'s body and clothing, the trash bag P.W. was wrapped in, the duct tape around her body, and defendant's carpet and bed cover were determined to be consistent with the blue tarp fabric found near the creek where P.W.'s body was

recovered. North Carolina State Bureau of Investigation Special Agent James Gregory testified that neither defendant nor his maternal relatives could be excluded as the source of a small Caucasian hair fragment found in P.W.'s anal cavity during the autopsy. Special Agent Gregory also testified that the hairs collected from the living room carpet sample and defendant's vacuum cleaner were "microscopically consistent" with P.W.'s hair, meaning they could have come from P.W. or anyone else whose hair had similar characteristics. Finally, Special Agent Gregory testified about his examination of the contents of the trash bag in which P.W.'s body was found. Among the debris found in the trash bag, he discovered nine to ten body hair fragments consistent with African ancestry. Special Agent Gregory did not conduct any further testing on these fragments (hair samples) because he was "specifically looking for Caucasian head hairs." State Bureau of Investigation Special Agent Suzi Barker testified that she examined the vaginal and rectal swabs and smears from P.W.; however, she saw no sperm or semen in any of the samples.

On 8 July 2005, the jury convicted defendant of first-degree murder based on malice, premeditation, and deliberation, as well as under the felony murder rule. The jury also convicted defendant on all remaining charges, except for the charge of lewd and lascivious conduct, which the trial court dismissed. Following a capital sentencing proceeding in which defendant represented himself without assistance of counsel, the jury found two aggravating circumstances regarding the murder: (1) defendant committed the murder while engaged in the commission of rape, first-

degree sexual offense, or kidnapping, and (2) the murder was especially heinous, atrocious, or cruel.  The jury found as a non-statutory mitigating circumstance that defendant has a learning disability.  After determining the mitigating circumstance was insufficient to outweigh the aggravators, the jury recommended and the trial court imposed the death penalty.  The trial court also ordered that defendant serve additional terms totaling 809 to 1010 months for the noncapital convictions. Defendant appealed directly to this Court, and this Court allowed defendant's motion to bypass the Court of Appeals as to his appeals from the noncapital convictions.

On 12 December 2008, this Court remanded the case to the trial court for a further hearing to determine whether defendant was capable of self-representation under *Indiana v. Edwards,* 554 U.S. 164, 171 L. Ed. 2d 345 (2008).  *See State v. Lane*, 362 N.C. 667, 668, 669 S.E.2d 321, 322 (2008) (per curiam), *clarified by* ___ N.C. ___, 706 S.E.2d 775 (2009) (order) (instructing the trial judge to determine whether defendant fell within the category of "borderline-competent" or "gray-area" defendants who are "competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves").  The trial court conducted an evidentiary hearing and determined that defendant was not a "borderline-competent" or "gray-area" defendant as defined in *Edwards*, and was thus competent to represent himself.

Considering the *Edwards* issue and others, on 11 March 2011, this Court found that "defendant received a fair trial and capital sentencing proceeding free of prejudicial error, and that the death sentence recommended by the jury and imposed by the trial court [was] not excessive or disproportionate." *State v. Lane,* 365 N.C. 7, 40, 707 S.E.2d 210, 230, *cert. denied*, 565 U.S. 1081, 181 L. Ed. 2d 529 (2011).

Defendant was appointed postconviction counsel, and on 12 December 2014, defendant filed a motion pursuant to N.C.G.S. § 15A-269 seeking postconviction DNA testing of the vaginal and rectal swabs and smears collected from the victim's body during an autopsy. The State did not object, and on 7 January 2015, the trial court entered an order permitting defendant to submit the vaginal and rectal swabs and smears to Sorenson Forensics, LLC (Sorenson), an independent laboratory approved by the North Carolina State Crime Laboratory for DNA testing pursuant to N.C.G.S. § 15A-266.7(a)(2). An initial forensic case report, dated 25 March 2015, indicated that Sorenson found sperm that the North Carolina State Crime Laboratory failed to detect in the vaginal and rectal swabs and smears. The trial court conducted a hearing on 2 April 2015 to determine what further DNA testing was required to assess whether the postconviction DNA testing results were favorable or unfavorable to defendant pursuant to N.C.G.S. § 15A-270. Defendant agreed to further DNA testing on the vaginal and rectal swabs and smears, and the trial court ordered Sorenson to conduct STR and Y-STR DNA testing on the sperm fraction discovered

in the vaginal and rectal swabs and compare the results with defendant's liquid blood sample taken in 2002 and defendant's newly ordered buccal (cheek) swab sample.

On 11 May 2015, the trial court held an evidentiary hearing under N.C.G.S. § 15A-270 to evaluate the results of Sorenson's DNA testing. Before the hearing, defendant objected to any evidence that would be offered by the State on whether the results of Sorenson's DNA testing were favorable or unfavorable to him because no motion for appropriate relief regarding the DNA evidence was pending before the court. Nonetheless, finding the proceeding was governed by N.C.G.S. §§ 15A-269 and 15A-270, the court heard evidence from the State regarding the Sorenson DNA testing results. Specifically, the State introduced five forensic case reports from Sorenson detailing the STR DNA and Y-STR DNA testing of the vaginal and rectal swabs and smears collected from the victim during autopsy and their comparisons with defendant's bloodstain card and the new sample of defendant's DNA. The reports established that the Y-STR DNA profile recently obtained from defendant and the Y-STR DNA profile obtained from defendant's bloodstain card matched the Y-STR DNA profile obtained from the epithelial and sperm fractions of the vaginal swabs and the sperm fraction of the rectal swabs collected from the victim's body by the medical examiner during the autopsy. Additionally, the reports indicated that the sperm fraction of the vaginal swabs collected from the victim's body by the medical examiner during autopsy contained a mixture of STR DNA profiles from two contributors, defendant being included as a possible contributor and the other

contributor likely being the victim. Defendant did not object to the State's motion to introduce any of the case reports and stipulated to the written language on all the reports. From this evidence (hereinafter Sorenson evidence), the trial court found that the postconviction DNA testing results were "unfavorable" to defendant, announcing its finding in open court; however, after the State drafted and submitted a proposed written order to opposing counsel, defendant objected to entry of the order based on his various challenges to the way evidence was handled and processed by the SBI. The trial court never signed a written order containing the finding that the postconviction DNA testing results were unfavorable to defendant.

On 3 June 2015, defendant filed a new motion for postconviction DNA testing of the hair samples found in the trash bag in which the victim's body had been placed. Defendant requested that these hair samples be submitted for independent DNA testing, other forensic testing, or both. Defendant argued to the trial court that the requested DNA testing is "unquestionably material" to his defense because

> [t]he hairs obtained from the plastic bag and duct tape wrapped around the victim was [sic] examined microscopically but not submitted for DNA analysis. Given Mr. Lane's continued insistence that he is innocent, the identity of the perpetrator in this case remains at issue. The tests requested are likely to resolve this issue by identifying the perpetrator and/or confirming Mr. Lane's claim of innocence . . . .

This time, the State opposed the motion, asking the trial court to deny the request or hold a hearing to determine whether defendant could show the testing sought "is

material to his defense."

The trial court heard defendant's motion on 9 July 2015. Defendant argued the requested DNA testing was material for two reasons: (1) the evidence at trial showed there were two separate crimes: "There was a rape, and there was a murder. The [Sorenson DNA] evidence that has come back has implicated our client in the rape . . . . We contend that these hairs could potentially relate to another perpetrator, and potentially the only perpetrator of that murder"; and (2) at trial, the State's closing argument relied in part on the forensic analysis of fourteen head hairs recovered from defendant's residence that were found to be microscopically consistent with P.W.'s head hairs: "If those head hairs that were found in that vacuum roll at Mr. Lane's house were material to the State . . . these hairs found on the body of the victim are clearly material."

The trial court entered an order on 18 August 2015 denying defendant's motion for postconviction DNA testing of hair samples citing defendant's failure "to show that the requested postconviction DNA testing of hair samples is material to his defense" in accordance with N.C.G.S. § 15A-269. In reaching its decision, the trial court considered: (1) the court file, (2) the evidence presented at trial, (3) defendant's motion for postconviction DNA testing of hair samples and the State's response to that motion, (4) the arguments of counsel, (5) defendant's prior motion for postconviction DNA testing of the vaginal and rectal swabs and smears collected from P.W.'s body during autopsy, and (6) the materials generated by Sorenson after

conducting the court-ordered postconviction DNA testing of the vaginal and rectal swabs and smears. In considering all of this information, the trial court specifically stated it "does not find the existence of a reasonable probability that the verdict would have been more favorable to Defendant Lane if the testing being requested in Defendant Lane's current motion had been conducted on the evidence."

On 28 August 2015, defendant filed a written notice of appeal pursuant to N.C.G.S. § 15A-270.1. On appeal, defendant first argues it was error for the trial court to consider the Sorenson evidence in its materiality analysis of defendant's hair sample testing request when there were contested factual issues regarding the validity of the Sorenson evidence. Second, even if the first round of postconviction DNA testing performed by Sorenson was determined to be valid and relevant, the hair sample DNA testing is still material to his defense because the results could implicate a second perpetrator in the crimes, specifically in the killing of the victim, or confirm his claim of innocence. In his third argument, defendant requests that, regardless of whether the testing is material to defendant's defense, this Court should use its constitutional supervisory authority or inherent authority to order the testing.

Although the standard of review for denial of a motion for postconviction DNA testing has not been expressly stated by this Court, we adopt, as the Court of Appeals did in *State v. Gardner*, the analogous standard of review for a denial of a motion for appropriate relief (MAR) because the trial court sits as finder of fact in both

circumstances. *See State v. Gardner*, 227 N.C. App. 364, 365-66, 742 S.E.2d 352, 354 (2013), *disc. rev. denied*, 367 N.C. 252, 749 S.E.2d 860 (2013). In reviewing a denial of a motion for postconviction DNA testing, "[f]indings of fact are binding on this Court if they are supported by competent evidence and may not be disturbed absent an abuse of discretion. The lower court's conclusions of law are reviewed *de novo*." *Id.* at 365-66, 742 S.E.2d at 354, (italics added) (quoting *State v. Patton*, 224 N.C. App. 399, 2012 WL 6590534, at *2 (2012) (unpublished) (citations omitted), *petitions for disc. rev. and cert. dismissed*, 366 N.C. 565, 738 S.E.2d 375 (2013)). A trial court's determination of whether defendant's request for postconviction DNA testing is "material" to his defense, as defined in N.C.G.S. § 15A-269(b)(2), is a conclusion of law, and thus we review de novo the trial court's conclusion that defendant failed to show the materiality of his request.

As with proceedings for postconviction MARs, "the moving party has the burden of proving by a preponderance of the evidence every fact essential to support" the motion for postconviction DNA testing, which includes the facts necessary to establish materiality. N.C.G.S. § 15A-1420(c)(5) (2017); *accord State v. Turner*, 239 N.C. App. 450, 453-54, 768 S.E.2d 356, 359 (2015) *(quoting State v. Adcock*, 310 N.C. 1, 37, 310 S.E.2d 587, 608 (1984)).

Section 15A-269 of the North Carolina General Statutes states, in relevant part:

(a) A defendant may make a motion before the trial court that entered the judgment of conviction against the defendant for performance of DNA testing . . . if the biological evidence meets all of the following conditions:

(1) Is *material* to the defendant's defense.

(2) Is related to the investigation or prosecution that resulted in the judgment.

(3) Meets either of the following conditions:

a. It was not DNA tested previously.

b. It was tested previously, but the requested DNA test would provide results that are significantly more accurate and probative of the identity of the perpetrator or accomplice or have a reasonable probability of contradicting prior test results.

(b) The court shall grant the motion for DNA testing . . . upon its determination that:

(1) The conditions set forth in subdivisions (1), (2), and (3) of subsection (a) of this section have been met;

(2) *If the DNA testing being requested had been conducted on the evidence, there exists a reasonable probability that the verdict would have been more favorable to the defendant*; and

(3) The defendant has signed a sworn affidavit of innocence.

N.C.G.S. § 15A-269 (2017) (emphases added). The materiality standard that a

defendant must assert in his motion, and that the trial court must find, is contained

in subdivision 15A-269(b)(2): "If the DNA testing being requested had been

conducted on the evidence, there exists a reasonable probability that the verdict would have been more favorable to the defendant." This definition of "material" is consistent with how that term has been defined in the context of claims based on *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed.2d 215 (1963).[3] Given the similarities in the *Brady* materiality standard and the standard contained in N.C.G.S. § 15A-269(b)(2), it appears the General Assembly adopted the *Brady* standard to guide a trial court in determining whether a defendant's request for postconviction DNA testing should be allowed. In such context, this Court has explained that "material" means "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Tirado*, 358 N.C. 551, 589, 599 S.E.2d 515, 540 (2004) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494 (1985), *cert. denied,* 544 U.S. 909, 161 L. Ed. 2d 285 (2005)). The determination of materiality must be made "in the context of the entire record," *State v. Howard*, 334 N.C. 602, 605, 433 S.E.2d 742, 744 (1993) (quoting *United States v. Agurs*, 427 U.S. 97, 112, 49 L. Ed. 2d 342, 355 (1976)), and hinges upon whether the evidence would have affected the jury's deliberations. In the context of a capital case, we must consider whether the evidence would have changed the jury's verdict in either the guilt or sentencing phases. *See Brady*, 373 U.S. at 87,

---

[3] In *Brady*, the United States Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87, 10 L. Ed. 2d at 218.

10 L. Ed. 2d at 218.

In his first issue, defendant argues that the trial court erred in considering the Sorenson results in the court's materiality analysis of defendant's request for DNA testing of the hair samples because contested factual issues remained regarding the validity of the Sorenson results. Defendant takes issue with the trial court's finding number twenty-two in its order denying his request for postconviction DNA testing of the hair samples. In this finding, the trial court listed the evidentiary considerations which led it to conclude that defendant's request for postconviction DNA testing of the hair samples was not material to his defense. Specifically, the court considered

> the evidence that was presented at trial, Defendant Lane's current motion for post-conviction DNA testing of hair samples, the State's response to that motion, the arguments of counsel, Defendant Lane's prior motion for post-conviction DNA testing of the vaginal and rectal swabs and smears collected from the victim's body by the medical examiner during autopsy which was granted by this Court, and *the materials generated by Sorenson Forensics after conducting that court-ordered post-conviction DNA testing*[.]

(Emphasis added.) The language in italics suggests the trial court relied in part on the Sorenson results in making its determination that DNA testing of the hair samples was not material to the defense. Because of his unresolved challenges to the validity of the Sorenson results,[4] defendant contends that there should have been

---

[4] Defendant contends the trial court did not resolve his objection to the trial court's

greater factual development on the issues regarding this evidence before it was considered in the trial court's materiality analysis with respect to the DNA testing of hair samples.

Notwithstanding defendant's challenges to the validity of the Sorenson evidence, the second issue is dispositive of this case. As discussed below, despite defendant's contentions that the requested testing is material to his defense, we conclude that the additional overwhelming evidence of defendant's guilt presented at trial, the dearth of evidence at trial pointing to a second perpetrator, and the inability of forensic testing to determine whether the hair samples at issue are relevant to establish a third party was involved in these crimes together create an insurmountable hurdle to the success of defendant's materiality argument.[5]

At trial, the State's evidence showed that defendant, and defendant alone, raped, sodomized, and murdered P.W. Defendant's confession, introduced into evidence at trial, indicates defendant and P.W. were alone in defendant's residence when the crimes occurred. At no point did defendant mention a second perpetrator

---

draft order authored by the State. The trial court only rendered its decision orally during the evidentiary hearing on 11 May 2015 and has not yet entered an order stating the Sorenson evidence was unfavorable to defendant. On defendant's motion, this Court stayed further trial court proceedings while resolving the issue *sub judice*.

[5] We do not take a position on the validity of the Sorenson results from the first round of postconviction DNA testing or comment on the arguments made by the parties as to the trial court's ability to consider those results of that testing in the materiality analysis before us. We only conclude that, regardless of whether the Sorenson results are considered at all, there is not a reasonable probability that even a "favorable" result in the second round of testing would result in "a more favorable outcome for defendant" in a new trial.

in his confession. Defendant also confessed that he wrapped P.W. in a plastic trash bag that he got out of a trash can at his residence. The autopsy showed P.W. was alive when she was raped and sodomized, and was alive when she was put into the trash bag. The autopsy further showed the cause of P.W.'s death was asphyxiation secondary to suffocation; thus, the murder weapon was the trash bag that defendant confessed to both procuring and using. A Caucasian hair was found in P.W.'s anal canal, and forensic testing revealed that defendant, or his maternal relatives, could not be ruled out as the source of the hair.

Additionally, the State's forensic evidence revealed that the trash bag in which P.W. was found was consistent with the size, composition, construction, texture, red drawstrings, and reinforcement characteristics of the trash bags found in defendant's home. Fibers from a blue tarp and a roll of duct tape also found at defendant's home were consistent with the tarp and duct tape found near the location where P.W.'s body was found. Fourteen hairs consistent with the victim's head hairs were found in defendant's vacuum cleaner and carpet sample, confirming P.W. was in defendant's home, and these hairs exhibited signs of being cut, confirming P.W. was subjected to some kind of force.

The eyewitness testimony presented at trial is also consistent with defendant's confession that he, and he alone, moved P.W. to the creek and disposed of her body there. Several eyewitnesses testified that between 7:15 and 7:45 p.m. on the evening in question, they saw a man with a red scooter or moped equipped with a black basket,

who was wearing a light or white helmet, struggling with a large bundle wrapped in a blue tarp and with a child's red and white bicycle, near the bridge under which P.W.'s body was found. Three of those eyewitnesses indicated the man was white, while the other two did not identify his race. The only inconsistency in the eyewitness testimony that tended to support the argument that a second perpetrator may have been involved came from a single eyewitness who was confronted on cross-examination with the assertion that she initially told law enforcement that she saw a "black man with dark arms." But the eyewitness testified that she did not remember telling law enforcement the man she saw was African-American.

At trial, the foregoing evidence was sufficient to convict and sentence defendant even without the results of the first round of postconviction DNA testing, because the evidence at trial showed no semen present in the victim's vaginal and anal swabs. Therefore, regardless of any consideration of the Sorenson evidence, the trial evidence was ample to support a finding of defendant's guilt and dictated the trial court's ultimate conclusion on materiality.

Further, even if the hair samples in question were tested and found not to belong to the victim or defendant, they would not necessarily implicate another individual as a second perpetrator. Defendant argues that if he and P.W. are excluded as the source of the hair fragments, such a finding would result in a more favorable outcome for defendant; however, defendant failed to show the hair samples were placed in the trash bag at the time the crimes were committed. In addition to

the hair samples, the trash bag covering the victim was filled with other creek debris because the bag had holes in it and had been in the creek for almost two days. P.W.'s body was found underneath a public roadway, in a location frequented by fishermen, and was in the middle of a construction zone; thus, there was great potential for contamination of the hole-ridden, weathered trash bag. Also, defendant cannot show the hair samples were not already in the bag when the victim was placed inside it.

Therefore, even if the samples were tested and produced a "favorable" result to defendant, that is, they were found to belong to an individual other than P.W. or defendant, it is not reasonably likely that such a finding would change the verdict for defendant. "Where ample evidence, including eyewitness testimony and defendant's own admission to law enforcement, supported a finding of defendant's guilt, defendant's motion for post-conviction DNA testing did not allege a 'reasonable probability that the verdict would have been more favorable to the defendant.'" *State v. Pegram*, ___ N.C. App. ___, 808 S.E.2d 179, 2017 WL 6002819 at *1 (2017) (unpublished) (brackets omitted). In this case, though there is no eyewitness account of the crimes themselves other than defendant's confession, a plethora of eyewitness testimony corroborates defendant's own account of how he disposed of P.W.'s body. A great deal of physical evidence also ties items in defendant's home to the location where the victim's body was found and links defendant to the crimes committed against P.W. His confession is consistent with all of this evidence, and he never implicated a second perpetrator. All the evidence in this case points to defendant—

and defendant alone—as committing the crimes against the victim. In light of this evidence, defendant has failed to convince this Court that DNA testing of the hair samples is material regarding his convictions.

As to defendant's sentence, there is not a reasonable probability that the DNA testing of the hair samples would have changed the jury's recommendation of death. Here, the jury found two aggravating circumstances regarding the murder of P.W.: (1) defendant committed the murder while engaged in the commission of rape, first-degree sexual offense, or kidnapping, N.C.G.S. § 15A-2000(e)(5) (2017), and (2) the murder was especially heinous, atrocious, or cruel, *id*. § 15A-2000(e)(9) (2017). According to the plain language of subdivision 15A-2000(e)(5), the jury could have found this aggravating circumstance even if it believed defendant was merely an accomplice in the crimes perpetrated against P.W. Even if the hair samples were tested and the testing revealed they were from a third person, the jury would still be permitted to consider this aggravating factor if it was convinced another individual was involved in the crimes. Further, as already discussed, sufficient evidence—even without considering the Sorenson evidence—shows defendant committed a sexual offense against P.W. In addition to his confession, a Caucasian hair was discovered in P.W.'s anal canal during the autopsy, and defendant and his maternal relatives "could not be excluded" as the source. As to the N.C.G.S. § 15A-2000(e)(9) circumstance found by the jury, this murder, given the victim's age and the evidence detailing that she died by choking on her own vomit while wrapped in duct tape and

a trash bag either immediately after or during the commission of a sexual assault, could certainly be considered especially heinous, atrocious, or cruel even if there was evidence that another person could have been involved.

Therefore, no *reasonable* probability exists under the facts of this case that a jury would fail to convict defendant or would not recommend the death penalty, even if the jury were able to consider a potential third person's hair samples that were found in the damaged trash bag in which the victim's body was placed. In fact, defendant argued to the jury at trial that the presence of these hair samples in the trash bag implicated someone other than him in the crimes, but, in light of the remaining evidence, that argument appears to have had no effect on the jury's verdict or recommendation.

In addressing defendant's third issue, we also decline to use our inherent or supervisory power to order the testing regardless of materiality. During oral arguments, the parties asserted that this case implicated the balance between the thoroughness of reviewing a capital case and the finality of it. In reflecting on this balance, the Supreme Court of the United States recognized the dangers inherent in using postconviction DNA testing as an unfettered discovery tool:

> DNA testing alone does not always resolve a case. Where there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent. The availability of technologies not available at trial cannot mean that every criminal conviction, or even every criminal conviction involving biological evidence, is suddenly in doubt. The dilemma is

> how to harness DNA's power to prove innocence without unnecessarily overthrowing the established system of criminal justice.
>
> That task belongs primarily to the legislature.

*Dist. Att'y's Office v. Osborne*, 557 U.S. 52, 62, 174 L. Ed. 2d 38, 47-48 (2009) (citation omitted). In North Carolina, the General Assembly made a defendant's statutory right to postconviction DNA testing contingent upon several conditions precedent, one of which is the trial court's conclusion that the requested DNA testing is material to the defense. N.C.G.S. § 15A-269(a) (2017), (b)(2). The policy behind the law is "to assist federal, State, and local criminal justice and law enforcement agencies in the identification, detection, or exclusion of individuals who are subjects of the investigation or prosecution of felonies or violent crimes against the person," *id.* § 15A-266.1 (2017); *see State v. Doisey,* 240 N.C. App. 441, 445, 770 S.E.2d 177, 180 (2015) (explaining that the law governing postconviction DNA testing's "ultimate focus is to help solve crimes through DNA *testing*"), rather than provide postconviction capital defendants with an endless series of challenges. In this case, there is "enough other incriminating evidence" to convict and sentence defendant regardless of the results of any hair analysis and as noted previously, the hair analysis results could be irrelevant because, *inter alia*, the hairs could have already been in the bag when defendant placed P.W. in it, or they could have made their way into the bag while it was soaking in a creek, exposed to the elements for two days. Ordering the testing when defendant has failed to show that a reasonable probability

exists that the results of the requested testing would change the outcome of the case would set a precedent for allowing criminal defendants to ceaselessly attack the finality of criminal convictions without significantly assisting in the search for truth.

Therefore, we affirm the trial court's order denying defendant's motion requesting postconviction DNA testing of hair samples.

AFFIRMED.