IN THE SUPREME COURT OF NORTH CAROLINA

 2022-NCSC-26

 No. 234PA20

 Filed 11 March 2022

 STATE OF NORTH CAROLINA

 v.
 KELVIN ALPHONSO ALEXANDER

 On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision

 of the Court of Appeals, 271 N.C. App. 77 (2020), affirming an order entered on 1

 October 2018 by Judge Henry W. Hight, Jr., in Superior Court, Warren County,

 denying defendant’s motion for postconviction DNA testing. Heard in the Supreme

 Court on 5 October 2021.

 Joshua H. Stein, Attorney General, by Kristin J. Uicker, Assistant Attorney
 General, for the State-appellee.

 Glenn Gerding, Appellate Defender, by Anne M. Gomez, Assistant Appellate
 Defender, for defendant-appellant.

 Julie Boyer, Attorney at Law, by Julie C. Bower; Kelly M. Dermody; and Evan
 J. Ballan, for The Innocence Network, amicus curiae.

 ERVIN, Justice.

¶1 This case arises from a motion for postconviction DNA testing pursuant to

 N.C.G.S. § 15A-269 filed by defendant Kelvin Alphonso Alexander over two decades

 after he entered a plea of guilty to second-degree murder. At the conclusion of a
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 hearing held for the purpose of considering defendant’s motion, the trial court entered

 an order denying defendant’s request for postconviction DNA testing on the grounds

 that defendant had failed to show that the requested testing would be material to his

 defense. On appeal, we have been asked to determine (1) if defendants who are

 convicted on the basis of a guilty plea are entitled to obtain postconviction DNA

 testing pursuant to N.C.G.S. § 15A-269 and (2) if so, whether defendant made the

 necessary showing of materiality in this case. After careful consideration of the

 record in light of the applicable law, we affirm the decision of the Court of Appeals.

 I. Factual Background

 A. Substantive Facts

¶2 On the morning of 17 September 1992, Carl Boyd was found dead behind the

 counter of the Amoco service station that he managed in Norlina. After being

 dispatched to the Amoco station, Deputy Sheriff William H. Aiken of the Warren

 County Sheriff’s Office, who was accompanied by Special Agent D.G. McDougall of

 the State Bureau of Investigation, discovered that Mr. Boyd had been shot multiple

 times. A subsequent autopsy revealed that Mr. Boyd had sustained four gunshot

 wounds to his back, abdomen, and forearm, with the medical examiner having

 expressed the opinion that these wounds had been inflicted using a .22 caliber

 handgun.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

¶3 In the course of their examination of the Amoco station, Deputy Aiken and

 Special Agent McDougall seized several items of evidence, including a .22 caliber

 projectile and three .22 caliber shell casings that were discovered on the service

 station floor. In addition, Special Agent McDougall collected eighteen latent print

 lifts from various parts of the service station. An SBI analyst later determined that

 these lifts contained five usable latent fingerprints and two usable latent palm prints

 and that three of the fingerprints belonged to Mr. Boyd and his wife. The firearm

 that had been used to kill Mr. Boyd was never recovered.

¶4 On 19 September 1992, Deputy Aiken interviewed Orlinda Lashley, who had

 been in the crowd outside the Amoco station while the investigating officers were

 there. According to a subsequent report prepared by Special Agent R.G. Sims of the

 State Bureau of Investigation, Ms. Lashley told Deputy Aiken that she had arrived

 at the Amoco station at approximately 7:15 a.m. and had been standing next to the

 gas tanks when she heard shouting, followed by two loud noises, emanating from the

 interior of the service station. At that point, according to Ms. Lashley, two men

 emerged from the front of the store, one of whom Ms. Lashley identified by name as

 defendant. As defendant emerged from the Amoco station, defendant told Ms.

 Lashley, “Hold it bitch, if you make a move, you’re dead,” after which he and the other

 man got into a vehicle that they were using and drove away. Ms. Lashley claimed to

 have left to go home before returning to the service station, in which she found Mr.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 Boyd, who died while holding her hands. After walking to another business across

 the street and contacting law enforcement officers, Ms. Lashley noticed that

 defendant was in the crowd that had gathered outside the Amoco station.

¶5 In light of the information that Ms. Lashley had provided, Deputy Aiken placed

 defendant under arrest. At the time that he was questioned by investigating officers,

 defendant denied having had any involvement in the killing of Mr. Boyd and claimed

 that he had been at home in bed at the time of the robbery and murder. Defendant

 did, on the other hand, admit to having gone to the Amoco station and to having stood

 outside while investigating officers were in the building, although he denied having

 ever entered the service station after Mr. Boyd began operating the business. Tanika

 Brown, the teenage daughter of defendant’s father’s girlfriend, who lived with

 defendant, told Special Agent Sims that defendant had been in bed on the morning

 of Mr. Boyd’s death and that she had spoken to defendant at approximately 7:10 a.m.

 or 7:15 a.m. about borrowing a gold chain from him given that school photographs

 were to be taken that day.

¶6 On 21 September 1992, Deputy Aiken and Special Agent Sims interviewed Ms.

 Lashley for a second time. Although the investigating officers showed her a

 photographic lineup that contained images of six suspects, including defendant, Ms.

 Lashley failed to identify any of the individuals depicted in the photographic array.

 At the time of defendant’s sentencing hearing, Ms. Lashley explained that, even
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 though she had recognized defendant’s photo when she was shown the photographic

 lineup, she had not pointed him out because she had been asked to identify the second

 person that she had seen leaving the Amoco station rather than defendant. After the

 second interview, Ms. Lashley provided a formal statement describing what she had

 seen, which was handwritten by Special Agent Sims and which Ms. Lashley

 annotated and signed.

¶7 In this written statement, Ms. Lashley said that, after leaving the Amoco

 station, she had parked in a nearby driveway to clean herself and change her clothes,1

 at which point her “conscience was kicking in” and she “knew [she] had to go back.”

 In light of this attack of conscience, Ms. Lashley said that she drove to the F&S

 Convenience Store, which was located across the street from the Amoco station,

 where she learned that Mr. Boyd had been shot. After determining that investigating

 officers and emergency medical personnel had been dispatched to the wrong location,

 Ms. Lashley claimed to have called 911 and informed the dispatcher that the officers

 and emergency medical personnel were needed at the Amoco station. According to

 Ms. Lashley, she accompanied the paramedics into the service station, where she saw

 Mr. Boyd’s body, but did not “administer aid or touch him in any way.” Ms. Lashley

 stated that she had not spoken to investigating officers at that time because she “was

 1 At defendant’s sentencing hearing, Ms. Lashley testified that she was scared and

 had “lost control of her bladder.”
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 scared to death,” that she had known defendant for “most of his life,” that defendant

 had gone to school with her nephew, and that she knew defendant’s father. Although

 she was shown the photographic lineup again at the conclusion of this second

 interview, Ms. Lashley again failed to identify any of the individuals who were

 depicted in that array.

¶8 On 20 October 1992, Special Agent McDougall interviewed Nell and Bonnie

 Ricks concerning a robbery that had occurred at a rest area located on Interstate 85

 on the morning of Mr. Boyd’s murder. At the time of that conversation, Mr. Ricks

 stated that, at approximately 7:00 a.m., he and his wife had stopped at the rest area,

 which Deputy Aiken claimed to be a “two or three minutes’ drive” from the Amoco

 station, and that he was using the restroom when a Black male held him at gunpoint

 using what appeared to be a sawed-off shotgun or .22 caliber rifle and demanded to

 be given Mr. Ricks’ wallet. After handing over his wallet to the assailant, Mr. Ricks

 remained in the restroom for another minute before returning to his car and calling

 law enforcement officers. Ms. Ricks told Special Agent McDougall that she had seen

 a Black man who was at least six feet tall, slender, and approximately twenty-five

 years old exit the rest area building and enter an older, medium-sized white car.

 Although Ms. Ricks was later shown a photographic lineup that contained

 defendant’s image, Ms. Ricks did not identify anyone depicted in the lineup as the

 person that she had seen at the rest area.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 B. Procedural History

¶9 On 19 October 1992, the Warren County grand jury returned bills of

 indictment charging defendant with first-degree murder and robbery with a

 dangerous weapon. In the course of pretrial proceedings, the prosecutor informed

 defendant’s trial counsel that the State had a “credible eyewitness” who could identify

 defendant as Mr. Boyd’s killer and that there was a “substantial possibility that

 [defendant] would be convicted of first-degree murder.” The prosecutor did not,

 however, provide defendant’s trial counsel with Ms. Lashley’s name or give

 defendant’s trial counsel access to either Special Agent Sims’ report concerning

 Deputy Aiken’s initial interview with Ms. Lashley or the handwritten statement that

 Ms. Lashley had annotated and signed at the time of her second interview.

¶ 10 The charges against defendant came on for trial before Judge Knox V. Jenkins,

 Jr., at the 15 November 1993 criminal session of Superior Court, Warren County. On

 16 November 1993, during the process of selecting a death-qualified jury, defendant

 entered into a plea agreement with the State pursuant to which he agreed to plead

 guilty to second-degree murder in return for the dismissal of the robbery with a

 dangerous weapon charge, with sentencing to be left to Judge Jenkins’ discretion. In

 addition, the State agreed to produce its eyewitness at the sentencing hearing, during

 which she could be cross-examined by defendant’s trial counsel. After accepting
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 defendant’s guilty plea, Judge Jenkins scheduled a sentencing hearing for the

 following day.

¶ 11 In the course of the ensuing sentencing hearing, Ms. Lashley testified in a

 manner that was generally consistent with the written statement that she had signed

 and annotated at the time of her second interview with the investigating officers.

 Among other things, Ms. Lashley reiterated that, after leaving the Amoco station, she

 had stopped to clean herself and change clothes before returning to the F&S

 Convenience Store and calling for emergency assistance and that she had only

 entered the Amoco station with the paramedics for a brief period of time before

 returning to the exterior of the building. Finally, Ms. Lashley testified that she had

 known defendant “[p]ractically all his life” and added that their families had been

 close for as long as she could remember.

¶ 12 Defendant’s father, Willie Alexander, testified at the sentencing hearing

 concerning defendant’s background and education without making any mention of

 defendant’s whereabouts on the date of Mr. Boyd’s death. In the course of his

 sentencing argument, defendant’s trial counsel commented that Ms. Lashley had

 “presented a slightly different version” of what happened during the photo lineup

 proceedings, mentioned Ms. Lashley’s assertion that she had not been asked to

 identify defendant, and highlighted testimony from a classmate of Ms. Lashley’s

 nephew to the effect that, while he and defendant “may have [had] a slight crossing
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 of paths” in high school, they had graduated four years apart. Finally, defendant’s

 trial counsel pointed to Ms. Lashley’s testimony that she had not lived in Warren

 County from 1977, when defendant was five years old, to 1990, when defendant was

 eighteen years old. Prior to announcing his sentencing decision, Judge Jenkins

 observed that, in light of her demeanor, manner, and appearance, he believed that

 Ms. Lashley had “an obvious lack of any interest, bias[,] or prejudice” and “appeared

 to be fair in her testimony.” At the conclusion of the sentencing hearing and after

 finding the existence of two aggravating factors and no mitigating factors, Judge

 Jenkins entered a judgment sentencing defendant to a term of life imprisonment.

¶ 13 On 20 November 2002, defendant, who was proceeding pro se, filed a motion

 for appropriate relief in which he asserted claims for ineffective assistance of counsel

 and prosecutorial misconduct. On 4 April 2006, an evidentiary hearing was held

 before Judge R. Allen Baddour, Jr., for the purpose of considering the issues raised

 by defendant’s motion for appropriate relief. At the 4 April 2006 hearing, the

 prosecutor testified that the State’s case against defendant “rested almost exclusively

 on Ms. Lashley’s identification” of defendant as one of the men whom she had seen

 leaving the Amoco station and that he “presumed” that, in the event that Ms. Lashley

 had been unable to identify defendant as one of the perpetrators of the murder, Judge

 Jenkins would have permitted defendant to withdraw his guilty plea.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

¶ 14 Marvin Rooker, who served as one of defendant’s trial attorneys, testified that,

 although he had been aware that there were some potential issues relating to Ms.

 Lashley’s ability to identify defendant after viewing the photographic lineup, he

 believed that her testimony at the sentencing hearing had been “very credible” and

 that she had been “a good witness for the State.” Frank Ballance, who served as

 defendant’s other trial counsel, indicated that he had understood that defendant

 would have been allowed to withdraw his guilty plea in the event that the State’s

 alleged eyewitness had failed to testify. Mr. Alexander testified that defendant had

 been at home at the time of Mr. Boyd’s death and that he had told defendant’s trial

 counsel about his availability as an alibi witness prior to the entry of defendant’s

 guilty plea, with Mr. Rooker confirming that, even though he was aware of the

 possibility that defendant might be able to mount an alibi defense, defendant had

 elected to plead guilty anyway.

¶ 15 Dominic White, who had pled guilty to federal criminal charges in 2004 and

 remained in federal custody, testified that, while he was being debriefed by federal

 authorities, he had told them that, in 1992, his friend, John Terry, had confessed to

 having robbed and shot the owner of a convenience store in Warren County. Mr.

 White said that, while he and Mr. Terry had been driving through the area, Mr. Terry

 had stopped the car, run into the woods, and returned with what appeared to Mr.

 White to be a .22 caliber short-barrel assault rifle, which Mr. Terry claimed to have
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 been the firearm used in the robbery and shooting. On the other hand, Mr. Terry,

 who also testified at the evidentiary hearing, denied having shot Mr. Boyd or told Mr.

 White that he had done so and claimed that he did not know defendant and had never

 met him.

¶ 16 On 8 January 2007, Judge Baddour entered an order denying defendant’s

 motion for appropriate relief on the grounds that, at the time that defendant had

 entered his guilty plea, “he was fully aware that the State claimed it had an

 eyewitness” even though his trial counsel did not know the witness’ identity and had

 not had time to investigate her story, with the purpose of her testimony at sentencing

 having been to allow defendant “the opportunity to assess her testimony and

 credibility.” In addition, Judge Baddour determined that, by failing to seek to

 withdraw his guilty plea following Ms. Lashley’s testimony, defendant had expressed

 satisfaction “with the nature and quality of the testimony of [Ms.] Lashley” and that,

 even if defendant’s trial counsel had provided him with deficient representation in

 light of their failure to learn Ms. Lashley’s identity until the time of the sentencing

 hearing, there was “no reasonable probability” that, in the absence of that error,

 defendant would not have entered a plea of guilty.

¶ 17 On 18 March 2016, defendant filed a motion seeking postconviction DNA

 testing pursuant to N.C.G.S. § 15A-269 in which he requested the entry of an order

 compelling the performance of DNA and fingerprint testing on the three shell casings
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 and projectile that had been found in the Amoco station on the theory that, in the

 event that Mr. Terry’s DNA or fingerprints could be detected on these items, such a

 result would exonerate defendant. On 1 October 2018, the trial court entered an

 order denying defendant’s motion on the grounds that defendant had “failed to show

 that all the requirements of [N.C.G.S. §] 15A-269 ha[d] been met” and that “the

 evidence sought is not material in this post-conviction setting” given that “the firearm

 which fired the bullet that killed Carl Eugene Boyd has never been recovered and the

 requested DNA testing would not reveal the identity of who fired th[e] firearm [that]

 killed Carl Eugene Boyd.” Defendant noted an appeal to the Court of Appeals from

 the trial court’s order.

 C. Court of Appeals Decision

¶ 18 In seeking relief from the trial court’s order before the Court of Appeals,

 defendant contended that the trial court had erred by determining that the requested

 DNA evidence was not material. Arguing in reliance upon the Court of Appeals’

 earlier decision in State v. Randall, defendant asserted that the proper standard for

 assessing materiality in cases involving guilty pleas focused upon the extent to which

 “there is a reasonable probability that DNA testing would have produced a different

 outcome”—specifically, that the defendant “would not have pleaded guilty and

 otherwise would not have been found guilty.” 259 N.C. App. 885, 887 (2018).

 Defendant contended that, had a third person’s DNA had been found on the shell
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 casings and projectile and defendant’s DNA not been detected there, those results

 would have provided significant support for a conclusion that someone else had been

 involved in the commission of the crime that defendant had been convicted of

 committing. In defendant’s view, had such evidence been available and had he known

 about the “numerous problems” that tended to undermine Ms. Lashley’s

 identification testimony, there was a reasonable probability that he would not have

 entered a guilty plea. In addition, defendant asserted that there was a reasonable

 probability that, had he insisted upon going to trial instead of pleading guilty, he

 would not have been convicted given the newly available DNA evidence and the other

 exculpatory evidence that was available to him.

¶ 19 In response, the State contended that defendant was not entitled to seek

 postconviction DNA testing because he had entered a guilty plea. In the State’s view,

 defendant’s guilty plea deprived him of the ability to make the necessary showing of

 materiality given that he had not presented a “defense” for purposes of N.C.G.S. §

 15A-296(a)(1) and could not have obtained a “more favorable verdict” in the absence

 of a decision with respect to the issue of guilt rendered by a jury. In addition, the

 State asserted that the Court of Appeals’ decision in Randall had been overruled in

 State v. Sayre, 255 N.C. App. 215 (2020), aff’d per curiam, 371 N.C. 468 (2018)

 (observing that, “by entering into plea agreement with the State and pleading guilty,

 [the] defendant presented no ‘defense’ pursuant to [N.C.G.S.] § 15A-269(a)(1)”).
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 Finally, the State argued that, even if defendant’s guilty plea did not preclude him

 from seeking postconviction DNA testing, he had failed to make the necessary

 showing of materiality given that the evidence of his guilt was overwhelming and

 given that the presence of a third party’s DNA upon the relevant items of evidence

 “would show at best that someone other than [d]efendant touched the shell casings

 or projectile at some time [and] for some reason that need not have been related to

 the robbery-murder.” In the same vein, the State noted that Mr. White’s testimony,

 which had been given more than a decade after the entry of defendant’s guilty plea,

 could not support a finding of materiality given that the evidence in question had not

 been available at the time that defendant pled guilty and was sentenced.

¶ 20 In rejecting the State’s argument that a defendant who pleads guilty is not

 entitled to seek postconviction DNA testing pursuant to N.C.G.S. § 15A-269, the

 Court of Appeals concluded that its prior decision in Randall was controlling with

 respect to this issue and that “there may be rare situations where there is a

 reasonable probability that a defendant would not have pleaded guilty in the first

 instance and would have not otherwise been convicted had the results of DNA testing”

 been available at the time of the defendant’s guilty plea. State v. Alexander, 271 N.C.

 App. 77, 79 (2020) (citing Randall, 259 N.C. App. at 887). After acknowledging that

 the use of the word “verdict” might tend to suggest that the General Assembly

 intended to limit the availability of postconviction DNA testing to cases in which the
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 defendant had been convicted based upon a decision by a jury, the Court of Appeals

 concluded that “there is a strong counter-argument that the General Assembly did

 not intend for the word ‘verdict’ to be construed in such a strict, legal sense” and that

 the General Assembly had, instead, “intended for ‘verdict’ to be construed more

 broadly, to mean ‘resolution,’ ‘judgment’ or ‘outcome’ in a particular matter,”

 particularly given that a decision to adopt the more restrictive reading upon which

 the State relied might lead to the absurd result that postconviction DNA testing

 would not be available to a defendant who had been convicted at the conclusion of a

 bench trial. Id. at 80; see id. at 80 n. 1 (citing State v. Hemphill, 273 N.C. 388, 389

 (1968); N.C.G.S. § 1A-1, Rule 52 (2015)). Finally, the Court of Appeals concluded that

 this Court’s decision to affirm the Court of Appeals’ decision in Sayre did not

 constitute acceptance of the State’s position that postconviction DNA testing was not

 available to defendants who had been convicted on the basis of a guilty plea rather

 than a jury verdict because that question had not been before the Court in Sayre. Id.

 at 81.

¶ 21 After determining that defendant’s guilty plea did not preclude him from

 seeking postconviction DNA testing, the Court of Appeals held that the trial court

 had correctly concluded that defendant had failed to make the necessary showing of

 materiality. Id. at 81–82. In support of this decision, the Court of Appeals pointed

 to the “substantial evidence of [d]efendant’s guilt,” including (1) Ms. Lashley’s
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 testimony; (2) defendant’s admission that he had been at the Amoco station on the

 date of the murder; and (3) defendant’s guilty plea. Id. In addition, the Court of

 Appeals concluded that the mere presence of a third party’s DNA on the evidence that

 defendant sought to have tested did not necessarily exonerate him given the existence

 of a number of alternative explanations for the presence of a third party’s DNA on

 that evidence. Id. at 82.

¶ 22 In a separate opinion concurring in the result, then-Judge Berger opined that

 defendants who had been convicted on the basis of a plea of guilty plea did not have

 the right to seek postconviction DNA testing. Id. at 82 (Berger, J., concurring). As

 an initial matter, Judge Berger disputed the validity of the Court of Appeals’

 determination that this Court’s decision in Sayre was limited to the issue of

 materiality. Id. at 83–85. In addition, Judge Berger noted that, by pleading guilty,

 defendant had “waive[d] all defenses other than that the indictment charges no

 offense[,]” with the defenses that defendant had waived by entering a guilty plea

 having included the right to seek postconviction DNA testing. Id. at 85 (quoting State

 v. Smith, 279 N.C. 505, 506 (1971)). Judge Berger asserted that his colleagues had

 construed the term “verdict” in an excessively broad manner, that the relevant

 statutory expression should be understood in accordance with its “plain meaning,”

 and that, in order for a defendant to make the necessary showing of materiality,

 “there must have been a verdict returned by a jury.” Id. at 86–87. Finally, after
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 noting that N.C.G.S. § 15A-269(b)(3) provides that a defendant seeking to obtain

 DNA testing must execute an affidavit of innocence, Judge Berger opined that “[a]

 defendant who, under oath, admits guilt to a charged offense, cannot thereafter

 provide a truthful affidavit of innocence” as required by N.C.G.S. § 15A-269(b)(3). Id.

 at 87. This Court allowed defendant’s petition for discretionary review of the Court

 of Appeals’ decision on 12 August 2020.

 II. Substantive Legal Analysis

 A. Standard of Review

¶ 23 This Court reviews decisions of the Court of Appeals for errors of law. N.C. R.

 App. P. 16(a); State v. Melton, 371 N.C. 750, 756 (2018). “In reviewing a denial of a

 motion for postconviction DNA testing, ‘[f]indings of fact are binding on this Court if

 they are supported by competent evidence and may not be disturbed absent an abuse

 of discretion.’ ” State v. Lane, 370 N.C. 508, 517 (2018) (alteration in original)

 (quoting State v. Gardner, 227 N.C. App. 364, 365–66 (2013)). “A trial court’s

 determination of whether defendant’s request for postconviction DNA testing is

 ‘material’ to his defense, as defined in N.C.G.S. § 15A-269(b)(2), is a conclusion of law,

 and thus we review de novo [a] trial court’s conclusion that defendant failed to show

 the materiality of his request.” Id. at 517–18.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 B. Availability of Postconviction DNA Testing Following a Guilty Plea

¶ 24 According to N.C.G.S § 15A-269, a convicted defendant is entitled to obtain

 postconviction DNA testing of evidence that:

 (1) Is material to the defendant’s defense.

 (2) Is related to the investigation or prosecution
 that resulted in the judgment.

 (3) Meets either of the following conditions:

 a. It was not DNA tested previously.

 b. It was tested previously, but the requested
 DNA test would provide results that are
 significantly more accurate and probative of
 the identity of the perpetrator or accomplice
 or have a reasonable probability of
 contradicting prior test results.

 N.C.G.S. § 15A-269(a) (2021). A trial court is required to allow a request for

 postconviction DNA testing in the event that the criteria specified in N.C.G.S. § 15A-

 269(a) have been established and that:

 (2) If the DNA testing being requested had been
 conducted on the evidence, there exists a
 reasonable probability that the verdict would
 have been more favorable to the defendant; and

 (3) The defendant has signed a sworn affidavit of
 innocence.

 N.C.G.S. § 15A-269(b). “Materiality” as used in the statutory provisions governing

 postconviction DNA testing should be understood in the same way that “materiality”

 is understood in Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, Lane, 370
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 N.C. at 519, with the relevant inquiry being whether “there is a reasonable

 probability that, had the evidence been disclosed to the defense, the result of the

 proceeding would have been different.” United States v. Bagley, 473 U.S. 667, 682

 (1985).

¶ 25 The initial issue that we need to address in evaluating the validity of

 defendant’s challenge to the Court of Appeals’ decision to uphold the trial court’s

 order is whether our decision in Sayre should be understood to deprive defendants

 convicted on the basis of guilty pleas of the right to seek and obtain postconviction

 DNA testing even if they are otherwise able to satisfy the applicable statutory

 requirements. The majority at the Court of Appeals held in Sayre that the

 defendant’s “bare assertion that testing the identified evidence would ‘prove that [he]

 is not the perpetrator of the crimes’ is not sufficiently specific to establish that the

 requested DNA testing would be material to his defense.” State v. Sayre, No. COA17-

 68, 2017 WL 3480951, at *2 (N.C. Ct. App. Aug. 15, 2017) (unpublished). In addition,

 the Court of Appeals observed that, “by entering into a plea agreement with the State

 and pleading guilty, [the] defendant presented no ‘defense’ pursuant to [N.C.G.S.] §

 15A-269(a)(1)” and did not have the right to seek or obtain postconviction DNA

 testing. Id. at *2. In light of his belief that defendant had, in fact, made a sufficient

 showing of “materiality,” Judge Murphy dissented from his colleagues’ decision and

 concluded that the case should have been remanded to the trial court for further
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 proceedings. Id. at *3 (Murphy, J., dissenting). The defendant noted an appeal from

 the Court of Appeals’ decision to this Court based upon Judge Murphy’s dissent.

¶ 26 According to well-established North Carolina law, “[w]hen an appeal is taken

 pursuant to [N.C.G.S.] § 7A-30(2), the only issues properly before the Court are those

 on which the dissenting judge in the Court of Appeals based his dissent.” Clifford v.

 River Bend Plantation, Inc., 312 N.C. 460, 463 (1984). In light of that fact, the only

 issue before this Court in Sayre was whether the defendant had sufficiently alleged

 that the performance of postconviction DNA testing would be “material.” For that

 reason, our decision in Sayre did not address, much less resolve, the issue of whether

 a defendant whose conviction stemmed from a guilty plea is entitled to seek and

 obtain postconviction DNA testing. As a result, the extent to which a plea of guilty

 operates as a categorial bar to postconviction DNA testing pursuant to N.C.G.S. §

 15A-269 is a question of first impression for this Court.

¶ 27 In seeking to persuade us that defendants who have been convicted on the

 basis of a guilty plea are ineligible to seek postconviction DNA testing, the State

 contends that, “[u]nder the plain, unambiguous language of [N.C.G.S. §] 15A-269, a

 defendant who pled guilty cannot meet the statutory requirements that would entitle

 him to postconviction DNA testing.” In the State’s view, the statutory reference to a

 “verdict” demonstrates the General Assembly’s intent that the only persons entitled

 to seek postconviction DNA testing are those who were convicted as the result of a
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 jury verdict. According to the State, this relatively strict reading of the relevant

 statutory language would not exclude those found guilty at a bench trial from

 obtaining postconviction DNA testing given that N.C.G.S. § 15A-269 had been

 enacted in 2001, while criminal bench trials had not been authorized until 2013. As

 further support for this contention, the State directs our attention to several cases in

 which this Court used the term “verdict” to refer to the decision that the trial judge

 makes at the conclusion of a bench trial, see, e.g., State v. Puckett, 299 N.C. 727, 727

 (1980); State v. Willis, 285 N.C. 195, 197 (1974); State v. Brooks, 287 N.C. 392, 405

 (1975), and a decision by the Court of Appeals describing the ruling made by a district

 court judge at the conclusion of a bench trial as a “verdict,” see State v. Surles, 55 N.C.

 App. 179, 182 (1981). As a result, the State contends that “the standard [applicable

 to requests for postconviction DNA testing] does not apply to defendants who were

 convicted by means other than a factfinder’s decision at a trial.”

¶ 28 In addition, the State argues that, even though “[N.C.G.S. §] 15A-269(a)(1)

 presupposes that the defendant presented a ‘defense’ in order to evaluate whether

 the [DNA] evidence is relevant to that defense,” “a defense was never presented”

 “when a defendant enters a plea of guilty.” On the contrary, the State argues that,

 by pleading guilty, “the defendant admitted his guilt” and “waived all defenses” other

 than a challenge to the sufficiency of the indictment, including “his right to test the

 evidence before a jury.” In other words, the State contends that the fact that the
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 defendant entered a guilty plea demonstrates that he or she had no “defense” to which

 postconviction DNA testing could be material, with “[a]ny analysis of whether testing

 is material to [the d]efendant’s ‘defense’ [in cases involving guilty pleas necessarily]

 begin[ning] with speculation as to what his defense was.”

¶ 29 Aside from these arguments, which rely directly upon specific language that

 appears in N.C.G.S. § 15A-269, the State advances a number of prudential arguments

 in opposition to a decision to allow defendants convicted on the basis of guilty pleas

 to seek and obtain postconviction DNA testing. For example, the State asserts that

 allowing such a defendant access to postconviction DNA testing would be inconsistent

 with the statutory requirement that a defendant seeking such testing “sign[ ] a sworn

 affidavit of innocence,” N.C.G.S. § 15A-269(b)(3), on the theory that, in order “[t]o

 comply with this requirement, a defendant who pled guilty and swore himself to be

 ‘in fact guilty’ of the crime must either: (1) lie and swear he is innocent even though

 he knows he is not or (2) admit that his earlier statement of factual guilt was untrue.”

 In addition, the State argues that “[t]here is no precedent binding in North Carolina

 that applies Brady to guilty pleas,” a fact that the State believes to be “relevant

 because [N.C.G.S.] § 15A-269(b)(2) adopts the Brady standard” and “[t]he General

 Assembly is presumed to act ‘with full knowledge of prior and existing law and its

 construction by the courts,’ ” State v. Anthony, 351 N.C. 611, 618 (2000). Similarly,

 the State argues that a defendant’s decision to enter a guilty plea obviates the
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 necessity for the State to make a full evidentiary presentation at trial, “mak[ing] it

 difficult[,] if not impossible[,] for any court to evaluate how potential DNA testing

 might affect the fact finder’s assessment of the evidence.” Finally, the State expresses

 concern about the possibility that defendants might engage in “gamesmanship” by

 pleading guilty in order to avoid the full development of a trial record before filing a

 subsequent motion for postconviction DNA testing pursuant to N.C.G.S. § 15A-269.

¶ 30 In seeking to persuade us to uphold the Court of Appeals’ decision with respect

 to this issue, defendant argues, in reliance upon Randall, that, when the General

 Assembly enacted N.C.G.S. § 15A-269, it intended for defendants who were convicted

 based upon a plea of guilty to be able to seek post-conviction DNA testing. In support

 of this assertion, defendant directs our attention to the language of the statute, the

 practical consequences that will result from the differing ways in which the relevant

 statutory language can be construed, the remedial nature of the statute, the title of

 the legislation that enacted the statute, and the political and social context in which

 the statute was enacted. More specifically, defendant asserts that N.C.G.S. § 15A-

 269 was enacted during a period in which many individuals convicted of serious

 crimes were being exonerated through the use of modern DNA testing procedures,

 with the relevant statutory provisions having arisen from “concerns that there are

 people who have been convicted of serious crimes who are innocent.” In light of the

 remedial nature of N.C.G.S. § 15A-269, defendant contends that its language “must
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 not be given an interpretation that will result in injustice if it ‘may reasonably be

 otherwise consistently construed with the intent of the act,’ ” Nationwide Mut. Ins.

 Co., 293 N.C. 431, 440 (1977). According to defendant, interpreting N.C.G.S. § 15A-

 269 to exclude defendants whose convictions were based upon guilty pleas would

 result in significant injustice given that many defendants plead guilty in spite of the

 fact that they are factually innocent.

¶ 31 In defendant’s view, nothing in the language of N.C.G.S. § 15A-269 expressly

 excludes defendants who plead guilty from seeking postconviction DNA testing, with

 the manner in which Judge Berger parsed the relevant statutory language having

 involved a failure to give appropriate regard to the “eminently reasonable” reading of

 the statute that the Court of Appeals adopted in Randall and having overlooked the

 fact that, even though “the [General Assembly] has amended N.C.G.S. § 15A-269

 several times since its enactment,” it “has chosen not to amend the statute in reaction

 to Randall.” Furthermore, defendant contends that a strict reading of the term

 “verdict” would lead to the absurd result that any defendant convicted by a jury, but

 not a defendant convicted at a bench trial or a defendant who enters a plea of guilty

 in reliance upon the decision of the Supreme Court of the United States in North

 Carolina v. Alford, 400 U.S. 25 (1970), could successfully seek and obtain

 postconviction DNA testing by making the required statutory showing.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

¶ 32 Defendant points out that his sentencing hearing took place prior to the recent

 enactment of criminal justice reform legislation and at a time when defendants had

 limited access to pre-trial discovery and when prosecutors were required to try a first-

 degree murder case capitally if the record contained evidence tending to show that at

 least one aggravating circumstance existed. In addition, defendant notes that, at the

 time that he entered his guilty plea, there was strong public support for the death

 penalty and a significant number of death sentences were being imposed. See

 Barbara O’Brien & Catherine M. Grosso, Confronting Race: How a Confluence of

 Social Movements Convinced North Carolina to Go Where the McCleskey Court

 Wouldn’t, 2011 Mich. St. L. Rev. 463, 488 (2011); Cynthia F. Adcock, The Twenty-

 Fifth Anniversary of Post-Furman Executions in North Carolina: A History of One

 Southern State’s Evolving Standards of Decency, 1 Elon L. Rev. 113, 131, 131 n. 96

 (2009) (citations omitted). According to defendant, it was “against this backdrop that

 defendants charged with first-degree murder in the early 1990’s who were actually

 innocent had to decide whether to plead guilty rather than roll the dice with a jury

 and the appellate courts.”

¶ 33 Finally, defendant notes that he was not provided with either of Ms. Lashley’s

 statements and that he did not know the identity of the State’s eyewitness or the

 nature of her testimony prior to the sentencing hearing, so that he was left without

 “crucial information about the weakness of the State’s evidence” at the time that he
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 entered his guilty plea even though, in light of the fact that the State had evidence

 tending to show the existence of at least two possible statutory aggravating

 circumstances,2 his case had to be tried capitally. Defendant asserts that, despite the

 fact that he had “strongly and repeatedly proclaimed his innocence from the time of

 his arrest through the time of his plea,” “the lack of almost any knowledge of the

 evidence against him, combined with the fact that he was facing the death penalty in

 a very death-prone state, could cause even the most resolute of defendants to crack

 under the pressure.” As a result, for all of these reasons, defendant contends that

 defendants who enter guilty pleas should not be precluded from seeking and

 obtaining postconviction DNA testing pursuant to N.C.G.S. § 15A-269.

¶ 34 “The primary rule of construction of a statute is to ascertain the intent of the

 legislature and to carry out such intention to the fullest extent.” Burgess v. Your

 House of Raleigh, Inc., 326 N.C. 205, 209 (1990). Although the first step in

 determining legislative intent involves an examination of the “plain words of the

 statute,” Elec. Supply Co. of Durham v. Swain Elec. Co., 328 N.C. 651, 656 (1991),

 “[l]egislative intent can be ascertained not only from the phraseology of the statute

 2 The aggravating circumstances that the State might have had sufficient evidence to

 attempt to establish included that Mr. Boyd was killed during the commission of an armed
 robbery, see N.C.G.S. § 15A-2000(e)(5) (1992), and that the killing of Mr. Boyd “was
 committed for pecuniary gain,” see N.C.G.S. § 15A-2000(e)(6) (1992). However, in accordance
 with this Court’s decision in State v. Quesinberry, 319, N.C. 228, 238 (1987), the jury would
 have only been entitled to consider one of these two factors had it been called upon to
 determine whether defendant should have been sentenced to death.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 but also from the nature and purpose of the act and the consequences which would

 follow its construction one way or the other,” Sutton v. Aetna Cas. & Sur. Co., 325

 N.C. 259, 265 (1989) (citations omitted). As this Court has clearly stated, remedial

 statutes such as N.C.G.S. § 15A-269 “should be construed liberally, in a manner

 which assures fulfillment of the beneficial goals, for which [they were] enacted and

 which brings within [them] all cases fairly falling within its intended scope.” Burgess

 v. Joseph Schlitz Brewing Co., 298 N.C. 520, 524 (1979).

¶ 35 As defendant points out, nothing in the text of N.C.G.S. § 15A-269 expressly

 precludes defendants who have pleaded guilty from seeking postconviction DNA

 testing.3 In addition, the relevant statutory language is not devoid of ambiguity. See

 3 The General Assembly does, of course, understand how to limit the rights of
 convicted criminal defendants who have entered pleas of guilty to seek relief from their
 convictions and related sentences on direct appeal. For example, N.C.G.S. § 15A-1444 limits
 the ability of a convicted criminal defendant who entered a plea of guilty to seek appellate
 review of his or her conviction as a matter of right by providing that such a defendant may
 only contend on direct appeal that the evidence admitted at the sentencing hearing did not
 support the sentence imposed by the trial court or in the event that the trial court sentenced
 the defendant to a term of imprisonment that falls outside the presumptive range for a
 defendant convicted of committing an offense of the same class with the same prior record
 level, N.C.G.S. § 15A-1444(a1) (2021), and on the grounds that the trial court erred in
 ascertaining the defendant’s prior record level or the trial court’s judgment contained an
 unauthorized disposition or term of imprisonment. N.C.G.S. § 15A-1444(a2). Similarly, a
 defendant whose conviction rests upon a guilty or no contest plea may appeal the trial court’s
 decision to deny his motion to withdraw his plea of guilty or no contest. N.C.G.S. § 15A-
 1444(e). Finally, a defendant convicted on the basis of a plea of guilty is entitled to appellate
 review of the trial court’s decision to deny his or her motion to suppress unlawfully obtained
 evidence under certain circumstances. N.C.G.S. § 15A-979(b) (2021); see also State v.
 Reynolds, 298 N.C. 380, 397 (1979). Aside from these instances, however, a defendant
 convicted on the basis of a plea of guilty is only entitled to direct review in the appellate
 division by seeking the issuance of a writ of certiorari. N.C.G.S. § 15A-1444(a1).
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

Winkler v. N.C. State Bd. of Plumbing, 374 N.C. 726, 730 (2020) (describing an

ambiguous statute as one that is “equally susceptible of multiple interpretations”).

Although the presence of the term “verdict” in the relevant statutory language may

suggest that the General Assembly did, in fact, primarily have jury trials in mind at

the time that it drafted N.C.G.S. § 15A-269, we are unable to understand the term

“verdict” to operate as a limitation upon the reach of postconviction DNA testing

given the manner in which the statute, considered as a whole, is written and the

circumstances that led to its enactment. See State v. Winslow, 274 Neb. 427, 434, 740

N.W.2d 794, 799 (2007) (concluding that, despite the reference to a “trial” in

Nebraska’s postconviction DNA testing statute, that statute, when considered “as a

whole,” indicates that the Nebraska legislature did not intend to limit the availability

of postconviction DNA testing to persons who had been convicted at the conclusion of

a contested trial on the issue of guilt or innocence). While the decision of a jury may

be the quintessential example of what constitutes a “verdict,” the fact that a “verdict”

can consist of “an opinion or judgment,” New Oxford American Dictionary 1921 (3d

ed. 2010), or “[a]n expressed conclusion; a judgment or opinion,” American Heritage

Dictionary (5th ed. 2012), and the State’s concession that the term “verdict” as used

in N.C.G.S. § 15A-269(b)(2) can encompass more than “a jury’s or decision on the

factual issues of a case,” Verdict, Black’s Law Dictionary (11th ed. 2019), suggests

that the term “verdict” can be understood in a broader sense as well. See also id.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 (recognizing that “verdict” can also be defined “loosely, in a nonjury trial, [as] a judge’s

 resolution of the issues of a case” and that today the term “typically survives in

 contexts not involving a jury”). We have previously recognized that “[c]ourts may and

 often do consult dictionaries” to determine the ordinary meaning of words used in

 statutes and that such words “are construed in accordance with their ordinary

 meaning unless some different meaning is definitively indicated by the context.” State

 v. Ludlum, 303 N.C. 666, 671 (1981) (emphasis added). As a result, the mere fact

 that the relevant statutory language speaks in terms of a “verdict” does not, without

 more, necessarily suggest that postconviction DNA testing is only available to

 situations in which the defendant’s conviction stems from a decision on the merits of

 the issue of guilt or innocence by a trier of fact.

¶ 36 Similarly, we are not persuaded that the term “defense” as used in N.C.G.S.

 § 15A-269(a)(1) should be limited to the specific arguments that the defendant

 advanced before the trial court prior to his or her conviction. In ordinary parlance, a

 “defense” is nothing more than an “attempted justification or vindication of

 something.” New Oxford American Dictionary 454 (3d ed. 2010). Although a “defense”

 can be understood as “[a] defendant’s stated reason why the plaintiff or prosecutor

 has no valid case,” it can also be understood as “[a] defendant’s method and strategy

 in opposing the plaintiff or the prosecution,” Defense, Black’s Law Dictionary (11th

 ed. 2019) (emphasis added), with other sources having broadly defined the term as
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 “any matter that the defendant will in practice raise,” Glanville Williams, Textbook

 of Criminal Law 114 n.3 (1978); “[a] fact or law that provides a full or partial

 exoneration of the defendant against the charges or claims made in a lawsuit or

 prosecution,” American Heritage Dictionary (5th ed. 2012); and “the method and

 collected facts adopted by a defendant to protect himself against a plaintiff’s action,”

 Webster’s Third Int’l Dictionary (1961). Thus, the statutory reference to a “defense”

 is sufficiently broad to include any argument that might have been available to a

 defendant to preclude a conviction or establish guilt for a lesser offense.

¶ 37 The practicalities of the manner in which the criminal process functions

 provide additional grounds for believing that “defense” as used in N.C.G.S. § 15A-269

 should be read broadly. Aside from the fact that a defendant may contemplate relying

 upon many possible defenses before settling upon one or more of them for use before

 the trial court, a defendant may ultimately decide to refrain from presenting any

 “defense” at all and to enter a plea of guilty for a number of reasons that do not hinge

 upon his or her actual guilt or innocence, including a concern that the risk of a

 conviction is so great that a guilty plea represents the best way to avoid the

 imposition of a more severe sentence. See State v. Harbison, 315 N.C. 175, 180 (1985)

 (recognizing that there are “situations where the evidence is so overwhelming that a

 plea of guilty is the best trial strategy”). As a result, the mere fact that a particular

 defendant elects to enter a guilty plea does not mean that he or she had no defense
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 and would not have been willing to assert it had additional evidence been available.

 Cf. State v. Hewson, 220 N.C. App. 117, 124 (2012) (assessing whether the requested

 DNA evidence would be material to a heat of passion defense, even though that

 defense had not been raised at trial).

¶ 38 A broader reading of the reference to a “defense” in N.C.G.S. § 15A-269(a)(1)

 than that contended for by the State is also supported by other portions of the

 relevant statutory language, which requires a litigant seek such testing to show that

 postconviction DNA testing “[i]s material to the defendant’s defense” rather than to

 the defense that the defendant actually presented at trial. N.C.G.S. § 15A-269(a)(1).

 Put another way, the fact that N.C.G.S. § 269(a)(1) is couched in the present tense

 suggests a recognition on the part of the General Assembly that a defendant’s

 “defense” may evolve in light of newly available DNA evidence. As a result, the

 statutory reference to the defendant’s “defense” does not, without more, satisfy us

 that the General Assembly intended to limit the availability of postconviction DNA

 testing to defendants who were convicted at the conclusion of a contested trial on the

 issue of guilt or innocence.

¶ 39 The General Assembly enacted N.C.G.S. § 15A-269 by means of a piece of

 legislation entitled “An Act to Assist an Innocent Person Charged With or Wrongly

 Convicted of a Criminal Offense in Establishing the Person’s Innocence.” S.L. 2001-

 282, § 4, 2001 N.C. Sess. Laws 833, 837. As we have previously held, “even when the
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 language of a statute is plain, ‘the title of an act should be considered in ascertaining

 the intent of the legislature.’ ” Ray v. N.C. Dep’t of Transp., 366 N.C. 1, 8 (2012)

 (quoting Smith Chapel Baptist Church v. City of Durham, 350 N.C. 805, 812 (1999)).

 “[T]he title is part of the bill when introduced, being placed there by its author, and

 probably attracts more attention than any other part of the proposed law; and if it

 passes into law, the title thereof is consequently a legislative declaration of the tenor

 and object of the act.” State v. Keller, 214 N.C. 447, 447 (1938). As the title to the

 relevant legislation makes clear, the General Assembly enacted N.C.G.S. § 15A-269

 for the purpose of allowing wrongly convicted persons to assert and establish their

 innocence.

¶ 40 As of the date upon which the General Assembly enacted N.C.G.S. § 15A-269,

 a number of defendants who had been convicted of committing serious crimes had

 been exonerated as a result of DNA testing, a technology that had only become widely

 available in the relatively recent past. According to the National Registry of

 Exonerations, 102 people across the United States had been exonerated as a result of

 DNA testing from 1989 to 2001, with three of these cases having involved North

 Carolina defendants,4 one of whom had served four years in prison after having

 4 National Registry of Exonerations,
 https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx. The registry is a
 project of the Newkirk Center for Science & Society at the University of California-Irvine,
 the University of Michigan Law School, and the Michigan State University College of Law.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 entering a plea of guilty to committing a sexual assault before DNA testing

 demonstrated that he did not commit that crime.5

¶ 41 Any argument that innocent people do not enter guilty pleas and that the

 General Assembly could not have intended to create a situation in which defendants

 were allowed to make conflicting sworn statements concerning their guilt or

 innocence fails for a number of reasons as well. Aside from the fact that at least one

 North Carolina defendant who had been convicted based upon his plea of guilty had

 been exonerated through the use of DNA testing even before enactment of N.C.G.S.

 § 15A-269, of the 2,997 documented cases since 1989 in which individuals who have

 been exonerated after having been wrongfully convicted, 672—or over 22 percent—

 involved guilty pleas,6 with this number including thirteen cases arising in North

 Carolina, eight of whom were exonerated on the basis of DNA testing.7 For that

 reason, the available evidence clearly suggests that innocent people do, in fact, enter

 guilty pleas.

 5 Profile of Keith Brown, National Registry of Exonerations,
 https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3062 (last
 visited Mar. 2, 2022).
 6 National Registry of Exonerations,
 https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx (apply filter for “Guilty
 Plea”) (last visited March 2, 2022).
 7 National Registry of Exonerations,
 https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx. (apply filters for
 “North Carolina” and “Guilty Plea”) (last visited March 2, 2022).
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

¶ 42 An innocent person may plead guilty to the commission of a criminal offense

 for a number of perfectly understandable reasons. For example, an innocent

 defendant may elect to plead guilty to avoid the risks and uncertainties associated

 with a trial that may result in a more severe sentence than the one offered by the

 prosecutor pursuant to a plea agreement. See Corinna B. Lain, Accuracy Where it

 Matters: Brady v. Maryland in the Plea Bargaining Context, 80 Wash. U. L. Q. 1, 29

 (2002) (observing that an innocent defendant may choose to “cut [his or her] losses”

 and plead guilty when he or she is “faced with an intolerably high estimate of the

 chance of conviction at trial”). As evidence of that fact, we note that a 2002 report by

 the North Carolina Sentencing and Policy Advisory Commission, a body that provides

 recommendations to the General Assembly regarding sentencing legislation, found

 that defendants who enter guilty pleas “may get a shorter active sentence or avoid

 active time altogether by getting probation.” N.C. Sent’g & Pol’y Advisory Comm’n,

 Sentencing Practices Under North Carolina’s Structured Sentencing Laws 24 (2002)

 [hereinafter Sentencing Practices].8 In addition, entering a guilty plea provides the

 defendant with “more control over the sentence” and facilitates an outcome that “is

 more predictable than what a judge and jury may decide to do.” Id. Finally,

 defendants often plead guilty “out of pure fear” that they will be treated more harshly

 8 Available at
 https://www.nccourts.gov/assets/documents/publications/disparityreportforwebR_060209.pd
 f?1iTr9wYxjAeDSGBuk5MdRLfgFq0ELkz.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 if they insist upon pleading not guilty and going to trial, Daina Borteck, Note, Pleas

 for DNA Testing: Why Lawmakers Should Amend State Post-Conviction DNA Testing

 Statutes to Apply to Prisoners Who Pled Guilty, 25 Cardozo L. Rev. 1429, 1440 (2004),

 as is evidenced by the Sentencing and Policy Advisory Commission’s conclusion that

 “prosecutors are more likely to seek an aggravated sentence or to ask for consecutive

 sentences in cases that proceed through trial,” Sentencing Practices at 24, despite the

 fact that a defendant has a constitutional right not to be penalized for exercising the

 right to plead not guilty and be tried by a jury of his or her peers, State v. Maske, 358

 N.C 40, 61 (2004).

¶ 43 An innocent defendant may be particularly prone to enter a guilty plea in a

 potentially capital case like this one. As the Innocence Network points out in its

 amicus brief, an innocent defendant may be confronted with the difficult choice of

 “falsely plead[ing] guilty and serv[ing] time in prison, or risk[ing] execution,” with

 “many understandably choos[ing] the guilty plea” when “[f]aced with that dilemma.”

 Similarly, Judge Jed S. Rakoff of the United States District Court for the Southern

 District of New York has noted that the “plea bargain[ing] system, by creating such

 inordinate pressures to enter into plea bargains, appears to have led a significant

 number of defendants to plead guilty to crimes they never actually committed,” with

 defendants charged with rape and murder having presumably done “so because, even

 though they were innocent, they faced the likelihood of being convicted of capital
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 offenses and sought to avoid the death penalty, even at the price of life

 imprisonment.” Jed S. Rakoff, Why Innocent People Plead Guilty, N.Y. Rev. of Books

 (Nov. 20, 2014).9 As a result, an innocent defendant may well choose the relative

 certainty of the more lenient sentence associated with the entry of a guilty plea to the

 risk of receiving a more severe one following a guilty verdict rendered at trial. Any

 decision to limit the scope of the relief that the General Assembly intended to make

 available by means of the enactment of N.C.G.S. § 15A-269 to those whose convictions

 resulted from decisions made at the conclusion of trials on the merits overlooks the

 extent to which innocent people can be wrongfully convicted after pleading guilty,

 with there being no reason that we can identify for the General Assembly to have

 decided that wrongfully convicted individuals who pled guilty should be treated

 differently than wrongfully convicted individuals who were incarcerated as the result

 of decisions made by juries or trial judges sitting without a jury.

¶ 44 Finally, a criminal defendant is not required to admit guilt as a precondition

 for entering a valid plea of guilty. Aside from the fact that nothing in N.C.G.S. § 15A-

 1022 requires the defendant to make such an admission, the Supreme Court of the

 United States clearly held in Alford that “[a]n individual accused of crime may

 voluntarily, knowingly, and understandingly consent to the imposition of a prison

 9 Available at https://www.nybooks.com/articles/2014/11/20/why-innocent-people-
 plead-guilty/?lp_txn_id=1298990.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 sentence even if he is unwilling or unable to admit his participation in the acts

 constituting the crime.” 400 U.S. at 37. As a result, we do not believe that precluding

 a convicted criminal defendant from seeking postconviction DNA testing pursuant to

 N.C.G.S. § 15A-269 serves any interest that the State might have in upholding that

 truthfulness of information submitted for a court’s consideration, and that the

 concern that a defendant may execute an affidavit of innocence that conflicts with an

 earlier admission of guilt is insufficient, in our view, to justify a refusal to deprive a

 person who claims to have been wrongfully convicted of the right to seek and obtain

 postconviction DNA testing pursuant to N.C.G.S. § 15A-269.

¶ 45 The other prudential arguments that the State has advanced in support of a

 construction that denies the relief otherwise available pursuant to N.C.G.S. § 15A-

 269 to convicted defendants who enter guilty pleas do not strike us as persuasive

 either. As should be obvious, the most likely relief that a defendant who successfully

 obtains postconviction DNA testing that produces an exculpatory result can obtain

 will be the granting of a new trial. See N.C.G.S. § 15A-270(c) (2021). Although the

 ways of convicted criminal defendants are sometimes difficult to fathom, we find it

 hard to believe that such a person would enter a plea of guilty in order to improve his

 odds of procuring a new trial through the use of postconviction DNA testing given

 that he or she could have had a trial without subjecting himself or herself to the

 imposition of criminal sanction. For that reason, we do not find the State’s expression
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 of concern about “gamesmanship” on the part of criminal defendants who elect to

 enter pleas of guilty to be particularly compelling.

¶ 46 The same is true of the State’s contention that the General Assembly could not

 have intended for postconviction DNA testing to be made available to defendants who

 entered guilty pleas in light of the State’s interest in the finality of criminal

 judgments and the fact that this Court has never held that Brady relief was available

 to defendants whose convictions rested upon pleas of guilty.10 As an initial matter,

 we note that the State’s interest in the finality of criminal judgments is not absolute;

 indeed, the existence of statutory provisions relating to motions for appropriate relief

 and postconviction DNA testing demonstrates the General Assembly’s recognition

 that, on occasion, the State’s interest in finality should give way to other

 considerations. Moreover, the General Assembly has required a defendant to make

 a materiality showing as a precondition for obtaining postconviction DNA testing in

 recognition of the importance of the finality interest upon which the State relies.

 Lane, 370 N.C. at 524 (stating that allowing DNA testing in the absence of a

 10 Although the Supreme Court of the United States has not addressed the extent to

 which Brady claims can be asserted by defendants convicted on the basis of a guilty plea, at
 least three federal circuit courts have expressly allowed the assertion of such claims, Sanchez
 v. United States, 50 F.3d 1448, 1454 (9th Cir. 1995); Miller v. Angliker, 848 F.2d 1312, 1322
 (2d Cir. 1988); White v. United States, 858 F.2d 416, 424 (8th Cir. 1988), with one circuit
 having reached the opposite conclusion, United States v. Conroy, 567 F.3d 174, 178 (5th Cir.
 2009), and with other circuits having expressed uncertainty about the extent to which such
 claims are available without having explicitly prohibited them, see United States v.
 Moussaoui, 591 F.3d 263, 285 (4th Cir. 2010); United States v. Mathur, 624 F.3d 498, 506 (1st
 Cir. 2010).
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

materiality requirement “would set a precedent for allowing criminal defendants to

ceaselessly attack the finality of criminal convictions without significantly assisting

in the search for truth”). In addition, it seems to us that, subject to any constitutional

limitations that may otherwise exist, the General Assembly is free to adopt whatever

standard for making postconviction DNA testing available to convicted criminal

defendants that it thinks best and elected, in the exercise of its legislative authority,

to use a Brady-based standard for that purpose in N.C.G.S. § 15A-269. See Lane, 370

N.C. at 519. Finally, the Supreme Court of the United States and other courts have

successfully analyzed both materiality and the related concept of prejudice in the

postconviction context in cases arising from guilty pleas. See Hill v. Lockhart, 474

U.S. 52, 58–59 (1985) (holding that, in order to make the showing of prejudice

necessary to support an ineffective assistance of counsel claim in a guilty plea context,

the defendant “must show that there is a reasonable probability that, but for counsel’s

errors, he would not have pleaded guilty and would have insisted on going to trial”);

see also Buffey v. Ballard, 236 W. Va. 509, 515–16, 782 S.E.2d 204, 210–11 (2015)

(holding that the State’s failure to disclose certain DNA evidence violated the

defendant’s due process rights on the grounds that, if the evidence in question had

been disclosed to the defendant, he would not have entered a guilty plea or been

advised to do so by his attorney and would have been able to raise a reasonable doubt

about his guilt at trial); Miller, 848 F.2d at 1322 (concluding that, “if there is a
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 reasonable probability that but for the withholding of the information the accused

 would not have entered the recommended plea but would have insisted on going to a

 full trial, the withheld information is material” for purposes of Brady); Sanchez, 50

 F.3d at 1454 (holding that “the issue in a case involving a guilty plea is whether there

 is a reasonable probability that but for the failure to disclose the Brady material, the

 defendant would have refused to plead and would have gone to trial”). As a result,

 aside from the fact that the General Assembly appears to have had an absolute right

 to adopt a Brady-based standard for use in determining whether a defendant who

 had been convicted as the result of a guilty plea was entitled to postconviction DNA

 testing, there is ample basis for concluding that such a standard can readily be

 applied in the guilty plea context and is frequently used in addressing the validity of

 similar claims.11

¶ 47 Finally, the State’s expressions of concern about the difficulty of defeating a

 defendant’s effort to make the required showing of materiality arising from the fact

 11 The State’s argument in reliance upon Brady appears to rest upon the assumption

 that, by holding that the use of a Brady-based materiality standard was inherent in N.C.G.S.
 § 15A-269, we incorporated the entirety of the Supreme Court’s Brady-related jurisprudence
 in North Carolina’s postconviction DNA testing statute. Any such assumption misreads our
 decision in Lane, which did nothing more than utilize a materiality standard deemed
 appropriate for use in evaluating claims arising from the State’s failure to disclose
 exculpatory evidence to determine whether the defendant had made a sufficient showing to
 justify the entry of an order requiring postconviction DNA testing. As a result, the extent to
 which a convicted criminal defendant would have the ability to seek relief on the basis of
 Brady has no relevance to the proper resolution of the issue of whether a defendant who
 entered a guilty plea is entitled, in appropriate instances, to obtain postconviction DNA
 testing pursuant to N.C.G.S. § 15A-269.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 that the factual basis presentation that is necessary to support the acceptance of a

 guilty plea is less extensive than that needed to support a conviction at a contested

 trial on the merits and the risk that allowing defendants who entered guilty pleas to

 seek postconviction DNA testing will result in a flood of frivolous applications for such

 testing strike us as overstated. Although we acknowledge that our decision may well

 result in the filing of additional applications for postconviction DNA testing, the

 ability of the trial courts to summarily deny such applications in the event that the

 defendant fails to make an adequate initial showing of materiality should limit the

 resulting imposition upon the trial judiciary. In addition, we see no reason why the

 State should be precluded from submitting additional information bearing upon the

 issue of materiality in the event that the information contained in the existing record

 is not sufficient to permit the trial court to make an appropriate materiality

 determination.

¶ 48 As this Court has previously recognized, “[p]erhaps no interpretive fault is

 more common [in statutory construction cases] than the failure to follow the whole-

 text canon, which calls on the judicial interpreter to consider the entire text, in view

 of its structure and of the physical and logical relation of its many parts.” N.C. Dep’t

 of Transp. v. Mission Battleground Park, 370 N.C. 477, 483 (2018) (quoting Antonin

 Scalia & Bryan A. Gardner, Reading Law: The Interpretation of Legal Texts 167

 (2012)). After conducting such a review, we hold that, when read in context and in
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 light of its underlying purposes, N.C.G.S. § 15A-269 makes postconviction DNA

 testing available to individuals whose convictions rest upon guilty pleas in the event

 that those persons are otherwise able to satisfy the relevant statutory requirements.

 Any other construction of the relevant statutory language would thwart the General

 Assembly’s apparent intent to ensure that individuals who claim to have been

 wrongfully convicted and are able to make a credible showing of innocence have the

 opportunity to take advantage of a technology that has the potential to both

 definitively acquit the innocent and convict the guilty. As a result, for all of these

 reasons, we hold that the Court of Appeals did not err in determining that a defendant

 who pleads guilty is not disqualified from seeking postconviction DNA testing

 pursuant to N.C.G.S. § 15A-269.

 C. Materiality of DNA Evidence to Defendant’s Defense

¶ 49 The final issue that must be addressed in evaluating the validity of defendant’s

 challenge to the Court of Appeals’ decision to uphold the denial of defendant’s request

 for postconviction DNA testing is whether defendant made a sufficient showing of

 materiality, which requires defendant to demonstrate that, if the relevant evidence

 had been admitted at trial, “there exists a reasonable probability that the verdict

 would have been more favorable to the defendant.” N.C.G.S. § 15A-269(a)–(b); Lane,

 370 N.C. at 519; see also State v. Byers, 375 N.C. 386, 394 (2020) (construing

 “reasonable probability” to mean “a probability sufficient to undermine confidence in
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 the outcome” (quoting State v. Allen, 360 N.C. 297, 316 (2006)). The required

 “materiality” determination should be made based upon a consideration of the entire

 record and focus “upon whether the evidence would have affected the jury’s

 deliberations,” Lane, 370 N.C. at 519, with the applicable standard in guilty plea

 cases being whether “there is a reasonable probability that DNA testing would have

 produced a different outcome; for example, that [the] [d]efendant would not have

 pleaded guilty and otherwise would not have been found guilty,” Randall, 259 N.C.

 App. at 887 (emphasis in original).

¶ 50 In seeking relief from the Court of Appeals’ decision with respect to the

 materiality issue, defendant begins by arguing that the Court of Appeals erred by

 requiring him to “show that the requested testing necessarily would exclude his

 involvement in the crime.” In addition, defendant contends that the Court of Appeals

 “failed to conduct its materiality analysis in the context of the entire record” by

 neglecting to consider “highly relevant facts concerning [defendant’s] decision to

 plead guilty and the nature of the State’s evidence,” including the fact that defendant

 had “repeatedly proclaimed his innocence, went to trial, was very reluctant to plead

 guilty, and had a strong alibi.” In light of the fact that he had an alibi and the fact

 that the State’s case rested upon the testimony of a “single highly impeachable

 purported eyewitness,” defendant asserts that it was reasonably probable that he
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 would have been acquitted in the event that he was able to show the presence of third-

 party DNA on the shell casings and projectile found at the Amoco station.

¶ 51 According to defendant, the “reasonable probability” test applicable in

 postconviction DNA testing proceedings should be distinguished from both a

 “preponderance-of-the-evidence” test and a “sufficiency-of-the-evidence” test, with

 the Court of Appeals having erred by requiring him to show that “the presence of

 another’s DNA or fingerprints on . . . [the] evidence would . . . necessarily exclude

 [his] involvement in the crime,” Alexander, 271 N.C. App. at 82, given that this legal

 standard is “plainly inconsistent with the Brady standard of materiality this Court

 adopted in Lane.” In addition, defendant contends that the Court of Appeals decided

 the “materiality” issue based upon what it believed to be “substantial evidence of

 [d]efendant’s guilt,” which consisted of (1) Ms. Lashley’s eyewitness testimony; (2)

 defendant’s admission to having been at the Amoco station during the investigation

 into the robbery and murder; and (3) the admission of guilt inherent in defendant’s

 decision to plead guilty, see Alexander, 271 N.C. App. at 81–82, and argues that the

 Court of Appeals should have also considered (1) his continued protestations of

 innocence and his reluctance to plead guilty; (2) the fact that neither defendant nor

 his attorneys knew Ms. Lashley’s identity before the entry of defendant’s guilty plea;

 (3) his alibi evidence; (4) his claim that he had not been permitted to enter an Alford

 plea; and (5) his claim that his trial counsel had pressured him to plead guilty and
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 had told him that he would be released after serving ten years in the event that he

 pleaded guilty. As a result, defendant argues that, had the Court of Appeals

 conducted a proper materiality analysis, it would have determined that it was

 reasonably probable that he would not have entered a guilty plea in the event that

 he had been able to prove that third-party DNA had been detected on the shell casings

 and the projectile recovered from the Amoco station and that his own had DNA had

 not been present on that evidence.

¶ 52 Similarly, defendant contends that, had he elected to plead not guilty and gone

 to trial, there is a reasonable probability that he would not have been convicted of

 second-degree murder. In defendant’s view, the Court of Appeals erred by assuming

 that two people were involved in the robbery and murder of Mr. Boyd based upon Ms.

 Lashley’s “highly suspect” testimony, having devoted a substantial portion of his brief

 to an attack upon Ms. Lashley’s credibility that focused upon the conflicting accounts

 that Ms. Lashley gave of her activities on the day of the robbery and murder, her

 claims to have known defendant and his family for a lengthy period of time, and her

 failure to select defendant’s image from the photographic array that was shown to

 her. As a result, defendant contends that “it is reasonably probable [that] the jury

 would have found that she did not witness anything at all; that she was only at the

 Amoco [station] after the fact; and that there was only one person involved in the

 crime,” with evidence concerning the absence of defendant’s DNA from the shell
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 casings and projectile having a tendency to further undermine Ms. Lashley’s

 credibility and corroborate his contention that Ms. Lashley did not actually see him

 leaving the Amoco station in the aftermath of the robbery and murder.

¶ 53 Aside from his reliance upon what he contends is the suspect quality of Ms.

 Lashley’s testimony, defendant points to (1) the lack of forensic evidence linking him

 to the crime, (2) the existence of witnesses who could testify that he had been at home

 at the time of the murder, (3) the fact that another robbery during which a similar

 weapon was used had been committed in the vicinity of the Amoco station earlier that

 day, and (4) Mr. Terry’s alleged admission to having robbed and killed Mr. Boyd. In

 addition, defendant argues that his presence at the Amoco station in the aftermath

 of the robbery and murder had no significance given that “Norlina is a small town

 where a murder would [have been] a rare event” and that “there were many other

 people that had gathered at the crime scene besides [defendant].” As a result,

 defendant claims that “[t]here is more than a reasonable probability . . . that a jury

 would not have convicted [defendant] of [the] robbery and murder of [Mr.] Boyd” had

 third-party DNA been found on the shell casings and projectile and his own DNA not

 been detected.

¶ 54 In seeking to persuade us to uphold the Court of Appeals’ decision with respect

 to the materiality issue, the State begins by arguing that, “[w]hile the [Court of

 Appeals] did say that the requested testing would not exclude [d]efendant from
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 having been involved in the crime, it never said exclusion was the standard for

 showing materiality” and that the Court of Appeals had, instead, utilized the

 materiality standard articulated in Lane. According to the State, “[d]efendant

 himself [ ] introduced the idea that DNA testing would exclude him as the perpetrator

 when he stated in his motion that testing showing [Mr.] Terry’s DNA would

 ‘exculpate’ him.”

¶ 55 Secondly, the State contends that, even though “materiality is analyzed in the

 context of the entire record, the record is limited to only the evidence available at the

 time of the first trial.” For that reason, the State contends that the only evidence

 that this Court can consider in addressing the materiality issue is the testimony of

 the witnesses who took the stand at the sentencing hearing, with the only sentencing

 hearing evidence that had any bearing upon the issue of defendant’s guilt or

 innocence being the testimony of Ms. Lashley. In the State’s view, defendant is not

 entitled to rely upon any of the reports generated by investigating officers and

 forensic experts prior to the entry of defendant’s guilty plea on the grounds that “[n]o

 party authenticated, offered, or moved to admit these items into evidence at any

 proceeding” and that, even though “the reports very well may be authentic,” this

 Court cannot speculate concerning the manner in which or extent to which any party

 might have used those reports at trial. In the same vein, the State contends that the

 Court cannot consider testimony from Mr. Alexander, defendant’s father, or Ms.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 Brown, the daughter of Mr. Alexander’s girlfriend, concerning defendant’s location at

 the time of the robbery and murder given that they did not testify at defendant’s

 sentencing hearing and that the Court should disregard Mr. White’s testimony

 concerning Mr. Terry’s alleged involvement in the robbery and murder given that Mr.

 White provided this information years after defendant entered his guilty plea.

¶ 56 Finally, the State argues that defendant cannot show that the requested DNA

 evidence is material given that “the State’s eyewitness testimony identifying

 [d]efendant as one of the two robber-murders was overwhelming and favorable DNA

 test results would not contradict that evidence.” According to the State, “the presence

 of DNA from someone other than [d]efendant on a shell casing or projectile does not

 call into question [d]efendant’s guilt” because “[s]uch results would show at best that

 someone other than [d]efendant touched the shell casings or projectile at some time

 for some reason that need not have been related to the robbery-murder.” In addition,

 the State notes that Ms. Lashley had stated in all three of the accounts that she gave

 of her actions on the day of the robbery and murder that, after hearing gunshots, she

 had seen defendant and an unknown man leaving the Amoco station and that

 defendant had returned to the Amoco station later that day. The State describes Ms.

 Lashley’s account of the relevant events as “internally consistent and . . . based on

 personal experiences that made her testimony believable,” as even defendant’s trial

 counsel had acknowledged. As a result, the State urges us to uphold the Court of
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 Appeals’ determination that defendant had failed to make the necessary showing of

 materiality.

¶ 57 A careful review of the Court of Appeals’ opinion satisfies us that it did not

 misstate or misapply the applicable legal standard. After reciting the “reasonable

 probability” standard and noting that the burden of making the necessary showing

 of materiality rested upon defendant, the Court of Appeals stated that defendant had

 failed to show how it is reasonably probable that he would
 not [have] been convicted of at least second-degree murder
 based on the results of the DNA and fingerprint testing.
 That is, the presence of another’s DNA or fingerprints on
 this or other evidence would not necessarily exclude
 [d]efendant’s involvement in the crime. The presence of
 another’s DNA or fingerprints could be explained by the
 possibility that someone else handled the casings/projectile
 prior to the crime or that the DNA or fingerprints are from
 [d]efendant’s accomplice, as there were two involved in the
 murder.

 Alexander, 271 N.C. at 81–82. As we read the quoted language, the Court of Appeals

 simply stated that defendant had to provide sufficient evidence that he was not

 involved in the commission of a second-degree murder in order to show materiality

 and that a showing of the presence of a third party’s DNA on the shell casings and

 projectile did not, without more, tend to show that defendant had no involvement in
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 the killing of Mr. Boyd.12 Nothing in the Court of Appeals’ opinion in any way

 suggests that a defendant seeking to obtain postconviction DNA testing is required

 to prove that, in the event of favorable test results, the State’s evidence would have

 been insufficient to support a conviction or that the defendant would have definitely

 been acquitted. Instead, as the Court of Appeals noted, the inquiry that a court

 confronted with a request for postconviction DNA testing is required to conduct must

 focus upon whether it is “reasonably probable” that the outcome at trial would have

 been different. See Bagley, 473 U.S. at 682. As a result, we see nothing exceptional

 in the understanding of the applicable legal standard upon which the Court of

 Appeals relied in this case.

¶ 58 In addition, defendant has not satisfied us that the Court of Appeals failed to

 make its materiality decision “in the context of the entire record.” Lane, 370 N.C. at

 519 (quoting State v. Howard, 334 N.C. 602, 605 (1993)). The mere fact that the

 Court of Appeals did not address each and every piece of evidence presented by

 defendant does not mean that it failed to consider the entire record. Instead, as the

 Court of Appeals recognized, the fundamental problem with defendant’s materiality

 argument is that it overlooks certain weaknesses in the evidence upon which he relies

 12 In the interest of clarity, we note that our references to the presence of third-party

 DNA on the shell casings and projectile recovered from the Amoco station assume that
 defendant’s DNA is not detected on those items either.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

and fails to recognize that the evidence that he hopes to obtain from the performance

of DNA testing upon the shell casings and projectile has very little bearing upon the

issue of his own involvement in the robbery of the Amoco station and the killing of

Mr. Boyd. Aside from the fact that the State did not need to show that defendant

handled the weapon from which the fatal rounds were fired in order to establish his

guilt, proof of the presence of third-party DNA on the shell casings and projectile

would do nothing more than establish that, at some unspecified point in time,

someone other than defendant touched these items, an event that could have

happened before defendant or his accomplice obtained possession of the weapon or in

the aftermath of the killing of Mr. Boyd at or before the time that the items were

taken into the possession of the investigating officers.13 As a result, since none of

these explanations for the presence of third-party DNA on the shell casings and

projectile would be in any way inconsistent with Ms. Lashley’s contention that she

saw two men, one of whom was defendant, leaving the Amoco station in the aftermath

of the robbery and murder and since defendant would have been guilty of the murder

of Mr. Boyd on an acting in concert theory in the event that he had been present for

and participated in the commission of those crimes even if he had never personally

held the weapon from which the fatal shots were fired, see State v. Barnes, 345 N.C.

 13 In view of the fact that the weapon from which the fatal shots were fired was never

recovered, there is no way for postconviction DNA testing to shed any direct light upon the
identity of the person who actually killed Mr. Boyd.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 184, 233 (1997) (holding that, in the event that “two persons join in a purpose to

 commit a crime, each of them, if actually or constructively present, is not only guilty

 as a principal if the other commits that particular crime, but he is also guilty of any

 other crime committed by the other in pursuance of the common purpose” (quoting

 State v. Erlewine, 328 N.C. 626, 637 (1991)), we are unable to determine that the

 performance of DNA testing on the shell casings and projectile recovered from the

 Amoco station would provide material evidence of defendant’s innocence of second-

 degree murder.

¶ 59 In addition, we note that Judge Jenkins had the opportunity to hear Ms.

 Lashley’s testimony during the sentencing hearing and stated that he found her “to

 be fair in her testimony” and that her testimony was “reasonable and consistent with

 other believable evidence in the case.” Judge Jenkins’ assessment of Ms. Lashley’s

 credibility is reinforced by the actions of defendant’s trial counsel, who made no effort

 to obtain authorization to seek the withdrawal of defendant’s guilty plea after hearing

 Ms. Lashley testify on direct and cross-examination. See State v. Handy, 326 N.C.

 532, 539 (1990) (listing “the strength of the State’s proffer of evidence” as one of the

 factors that should be considered in deciding whether to allow a defendant to

 withdraw a guilty plea). Finally, we note that, despite the inconsistencies in the

 accounts that she gave of her activities on the morning of the robbery and murder,

 Ms. Lashley consistently asserted that she had visited the Amoco station on the
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 morning in question, that she had heard a commotion inside the store, and that she

 had seen two men, one of whom was defendant, leave the service station. As a result,

 given the contemporaneous assessments of Ms. Lashley’s testimony as credible; the

 fact that most, if not all, of the grounds for challenging the credibility of Ms. Lashley’s

 account of her activities on the morning of the robbery and murder were known to

 defendant’s trial counsel before the entry of judgment against defendant; and the fact

 that the DNA evidence that defendant seeks to obtain in this case would not tend to

 undercut the credibility of Ms. Lashley’s contention that defendant was one of the

 two men that she saw outside the Amoco station, we cannot conclude that the

 performance of the requested DNA testing would have had a material effect upon

 defendant’s or a jury’s evaluation of Ms. Lashley’s credibility at the time that Judge

 Jenkins entered judgment in this case.

¶ 60 We are also unpersuaded that the availability of evidence tending to provide

 defendant with an alibi controls the resolution of the materiality issue that is before

 us in this case. All of the witnesses whom defendant claims can corroborate his alibi

 were available at the time that defendant decided to enter his guilty plea. In addition,

 the existence of evidence tending to show the presence of third-party DNA on the

 shell casings and projectile recovered from the Amoco station would not have had any

 additional impact upon an evaluation of the credibility of defendant’s alibi witnesses

 given the fact that such evidence has little tendency to show that defendant was not
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 involved in the robbery of the Amoco station and the murder of Mr. Boyd. The same

 is true of the evidence concerning the robbery at the rest area, which has no clear

 relation to the issue of defendant’s guilt or innocence of the robbery of the Amoco

 station and the murder of Mr. Boyd, particularly given the absence of any non-

 hearsay evidence concerning Mr. Terry’s involvement in the commission of the crime

 which led to the entry of defendant’s guilty plea, the fact that Mr. Terry has denied

 any involvement in the commission of this crime, and the fact that evidence

 implicating Mr. Terry does not tend to exculpate defendant given Ms. Lashley’s claim

 to have seen two men leaving the Amoco station. See Barnes, 345 N.C. at 233.14

¶ 61 At the end of the day, this case is not materially different from Lane, in which

 the defendant was convicted of the kidnapping, rape, and first-degree murder of a

 five-year-old girl. Lane, 370 N.C. at 509, 513–14. In seeking postconviction DNA

 testing of hair samples taken from the trash bag in which the victim’s body was

 discovered, the defendant in Lane argued that DNA testing “could potentially relate

 14 We do agree with defendant that the Court of Appeals should not have considered

 the fact that he entered a guilty plea in making the required materiality determination or
 treated it as “substantial evidence” of guilt in light of the fact that the relevant issue for
 purposes of requests for postconviction DNA testing submitted by persons who entered guilty
 pleas is whether the new evidence would have impacted defendant’s decision to plead guilty
 in the first place. The same is true, however, of defendant’s persistence in proclaiming his
 innocence and his reluctance to enter a plea of guilty. Instead, the required materiality
 determination should focus upon the strength of the substantive evidence of defendant’s guilt
 and the likely impact that the results of the requested DNA testing would have had upon
 defendant’s decision to plead guilty and upon defendant’s chances for success at a subsequent
 trial on the merits.
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 to another perpetrator, and potentially the only perpetrator of [the] murder.” Id. at

 516. In rejecting the defendant’s challenge to the trial court’s determination that he

 had failed “to show that the requested postconviction DNA testing of hair samples

 [was] material to his defense,” we pointed to “the additional overwhelming evidence

 of defendant’s guilt presented at trial,” the absence “of evidence at trial pointing to a

 second perpetrator,” and “the inability of forensic testing to determine whether the

 hair samples at issue are relevant to establish a third party was involved” in the

 commission of the crimes for which the defendant was convicted. Id. at 516–20. In

 determining that, “even if the hair samples in question were tested and found not to

 belong to the victim or defendant, they would not necessarily implicate another

 individual as a second perpetrator,” we emphasized the fact that the defendant had

 not shown that the hair samples had been put into the trash bag at the time of the

 crime and that “there was great potential for contamination of the hole-ridden,

 weathered trash bag.” Id. at 522. Although the evidence of defendant’s guilt in this

 case is not as strong as the evidence of the defendant’s guilt in Lane, the relevance of

 the requested DNA evidence in the two cases is strikingly similar and suggests that

 the two cases should be resolved in the same manner.

¶ 62 The ultimate question that must be decided in resolving the materiality issue

 that is before use in this case is whether, all else remaining the same, a favorable

 DNA test result would have (1) probably caused defendant to refrain from pleading
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

 guilty and (2) probably resulted in a verdict that was more favorable to defendant at

 any ensuing trial. After conducting the required analysis, we conclude that the

 presence of third-party DNA on the shell casings and projectile recovered from the

 Amoco station would have done little, if anything, to improve defendant’s odds of

 achieving a more successful outcome than he actually obtained as a result of his guilty

 plea given the applicable legal standard, which focuses upon whether defendant

 actively participated in the robbery and murder that led to his conviction rather than

 upon whether defendant was the person that fired the fatal shots, and the fact that

 the availability of such evidence would had little tendency to show that defendant

 would have been better positioned to mount a successful defense to the charges that

 had been lodged against him or upon a jury’s evaluation of the credibility and weight

 that should be given to the other available evidence, including the credibility of Ms.

 Lashley’s testimony that she saw defendant leaving the Amoco station immediately

 after gunshots emanating from that location had been heard. As a result, we hold

 that the Court of Appeals did not err by concluding that defendant had failed to make

 the showing of materiality necessary to support an award of postconviction DNA

 testing.

 III. Conclusion

¶ 63 Thus, for the reasons set forth above, we hold that a defendant who enters a

 plea of guilty is not statutorily disqualified from seeking postconviction DNA testing
 STATE V. ALEXANDER

 2022-NCSC-26

 Opinion of the Court

pursuant to N.C.G.S. § 15A-269. We further hold, however, that defendant has failed

to establish that the requested DNA testing would be material to his defense in this

case. As a result, the decision of the Court of Appeals is affirmed.

 AFFIRMED.

 Justice BERGER did not participate in the consideration or decision of this

case.
 Chief Justice NEWBY concurring in the result.

¶ 64 I agree with the majority’s ultimate decision to uphold the trial court’s denial

 of defendant’s motion to test DNA evidence. I write separately, however, because I

 would hold that a defendant who pleads guilty cannot prevail on a postconviction

 motion to test DNA evidence under N.C.G.S. § 15A-269.1 Therefore, I concur in the

 result.

¶ 65 N.C.G.S. § 15A-269 provides in relevant part:

 (a) A defendant may make a motion before the
 trial court that entered the judgment of conviction against
 the defendant for performance of DNA testing and, if
 testing complies with FBI requirements and the data
 meets NDIS criteria, profiles obtained from the testing
 shall be searched and/or uploaded to CODIS if the
 biological evidence meets all of the following conditions:

 (1) Is material to the defendant’s defense.

 (2) Is related to the investigation or prosecution
 that resulted in the judgment.

 (3) Meets either of the following conditions:

 a. It was not DNA tested previously.

 b. It was tested previously, but the
 requested DNA test would provide
 results that are significantly more
 accurate and probative of the identity
 of the perpetrator or accomplice or have
 a reasonable probability of

 Were I to reach the issue of whether defendant made the necessary showing of
 1

 materiality in this case, I would agree with the majority’s analysis, except for the majority’s
 statement in footnote fourteen of its opinion.
 STATE V. ALEXANDER

 2022-NCSC-26

 Newby, C.J., concurring in the result

 contradicting prior test results.

 (b) The court shall grant the motion for DNA
 testing . . . upon its determination that:

 (1) The conditions set forth in subdivisions (1),
 (2), and (3) of subsection (a) of this section
 have been met;

 (2) If the DNA testing being requested had been
 conducted on the evidence, there exists a
 reasonable probability that the verdict would
 have been more favorable to the defendant;
 and

 (3) The defendant has signed a sworn affidavit of
 innocence.

 N.C.G.S. § 15A-269 (2021) (emphases added). “The primary endeavor of courts in

 construing a statute is to give effect to legislative intent. . . . If the statutory language

 is clear and unambiguous, the court eschews statutory construction in favor of giving

 the words their plain and definite meaning.” State v. Beck, 359 N.C. 611, 614, 614

 S.E.2d 274, 276–77 (2005) (citations omitted).

¶ 66 A plain reading of N.C.G.S. § 15A-269 demonstrates that a defendant who

 pleads guilty cannot meet the conditions necessary to prevail on a motion to test DNA

 evidence. First, a defendant who enters a guilty plea cannot show that “[i]f the DNA

 testing being requested had been conducted on the evidence, there exists a reasonable

 probability that the verdict would have been more favorable to the defendant.”

 N.C.G.S. § 15A-269(b)(2). In order for a trier of fact to reach a verdict in a criminal

 case, there must first be a trial. See State v. Hemphill, 273 N.C. 388, 389, 160 S.E.2d
 STATE V. ALEXANDER

 2022-NCSC-26

 Newby, C.J., concurring in the result

 53, 55 (1968) (“A verdict is the unanimous decision made by the jury and reported to

 the court.”). As such, the occurrence of a trial is a prerequisite to prevailing on a

 motion to test DNA evidence under N.C.G.S. § 15A-269(b)(2). When a defendant

 pleads guilty, no trial occurs, and thus no verdict is ever reached. Therefore, a

 defendant who pleads guilty can never meet the condition outlined in N.C.G.S.

 § 15A-269(b)(2).

¶ 67 Second, a defendant who enters a guilty plea cannot show that the relevant

 biological evidence “[i]s material to [his] defense.” N.C.G.S. § 15A-269(a)(1). The

 phrase “material to the defendant’s defense” presupposes that the defendant making

 the motion presented a defense before the trial court. Since a sample of biological

 evidence cannot be material to a defense that never occurred, a defendant who did

 not present a defense before the trial court cannot meet the condition outlined in

 N.C.G.S. § 15A-269(a)(1).

¶ 68 When a defendant pleads guilty, he fails to present a “defense” pursuant to

 N.C.G.S. § 15A-269(a)(1). In State v. Sayre, the “defendant pleaded guilty to fourteen

 counts of taking indecent liberties with a child, two counts of second[-]degree sexual

 offense, and two counts of felony child abuse.” State v. Sayre, No. COA17-68, 2017

 WL 3480951, at *1 (N.C. Ct. App. Aug. 15, 2017) (unpublished). The defendant later

 filed a motion to test DNA evidence which the trial court denied. Id. The Court of

 Appeals noted that the “defendant’s bare assertion that testing the identified
 STATE V. ALEXANDER

 2022-NCSC-26

 Newby, C.J., concurring in the result

 evidence would ‘prove that [he] is not the perpetrator of the crimes’ is not sufficiently

 specific to establish that the requested DNA testing would be material to his defense.”

 Id. at *2 (alteration in original) (citing State v. Cox, 245 N.C. App. 307, 312, 781

 S.E.2d 865, 868–69 (2016)). The Court of Appeals also stated that “by entering into a

 plea agreement with the State and pleading guilty, defendant presented no ‘defense’

 pursuant to N.C.[G.S.] § 15A-269(a)(1).” Id. As such, the Court of Appeals held “the

 trial court did not err by summarily denying defendant’s request for post-conviction

 DNA testing.” Id. The defendant appealed to this Court based upon the dissenting

 opinion at the Court of Appeals, and we issued a per curiam opinion affirming the

 Court of Appeals’ decision. State v. Sayre, 371 N.C. 468, 818 S.E.2d 101 (2018) (per

 curiam).2

¶ 69 The majority asserts that the term “defense” is not “limited to the specific

 arguments that the defendant advanced before the trial court prior to his or her

 conviction.” According to the majority, a “defense” includes “any argument that might

 have been available to a defendant to preclude a conviction or establish guilt for a

 lesser offense.” The majority’s primary support for this position is that the New

 2 The majority asserts that our per curiam opinion did not affirm the Court of Appeals’

 statement regarding the defendant’s presentation of a “defense” because that issue was not
 on appeal. Notably, however, in his brief before this Court, the defendant in Sayre argued
 that his guilty plea should not preclude him from establishing materiality. In response, the
 State argued that based upon the plain language of the statute, it is impossible for a
 defendant who pleads guilty to show materiality. Nevertheless, even if our decision did not
 affirm the Court of Appeals’ statement, the statement is still persuasive.
 STATE V. ALEXANDER

 2022-NCSC-26

 Newby, C.J., concurring in the result

 Oxford American Dictionary broadly defines “defense” as an “attempted justification

 or vindication of something.” More specifically, however, Black’s Law Dictionary

 defines “defense” as “[a] defendant’s stated reason why the . . . prosecutor has no valid

 case; esp., a defendant’s . . . plea <her defense was that she was 25 miles from the

 building at the time of the robbery>.” Defense, Black’s Law Dictionary (11th ed. 2019)

 (emphases added). This definition makes clear that a defendant’s “defense” refers to

 the arguments that he actually made at trial. See id. Nonetheless, the majority adopts

 an overbroad definition of “defense” in an effort to expand the applicability of

 N.C.G.S. § 15A-269. The majority’s interpretation effectively changes the statutory

 language from “material to the defendant’s defense,” N.C.G.S. § 15A-269(a)(1), to

 “material to any defense the defendant possibly could have presented, whether

 actually raised or not.” Such an interpretation disregards this Court’s duty to give

 “the words [of a statute] their plain and definite meaning.” Beck, 359 N.C. at 614, 614

 S.E.2d at 277.

¶ 70 Defendant here entered a guilty plea and indicated to the trial court that he

 was “in fact guilty.” Due to defendant’s guilty plea, a trier of fact did not reach a

 “verdict,” and defendant never provided a “defense.” Since defendant cannot meet the

 conditions outlined in N.C.G.S. § 15A-269(a)(1) and (b)(2), he is precluded from

 prevailing on his motion to test DNA evidence. Therefore, I concur in the result.

 Justice BARRINGER joins in this concurring opinion.
 Justice EARLS concurring in part and dissenting in part.

¶ 71 I concur fully in the portion of the majority opinion holding that defendants

 who enter a guilty plea are eligible to seek postconviction DNA testing under N.C.G.S.

 § 15A-269. In addition to the majority’s careful and correct examination of the

 statutory text, the circumstances surrounding the statute’s enactment, and the

 abundant evidence of legislative intent, the majority’s description of the practical

 realities as experienced by criminal defendants faced with the choice between

 entering a guilty plea and going to trial illustrates why a statute titled “An Act to

 Assist an Innocent Person Charged With or Wrongly Convicted of a Criminal Offense

 in Establishing the Person’s Innocence” cannot be read to categorically exclude

 defendants who have pleaded guilty. S.L. 2001-282, § 4, 2001 N.C. Sess. Laws 833,

 837.

¶ 72 The majority notes that defendants “ ‘fear’ that they will be treated more

 harshly if they insist upon pleading not guilty and going to trial.” There is reason to

 believe defendants’ fears are well-founded. See, e.g., Brian D. Johnson, Plea-Trial

 Differences in Federal Punishment: Research and Policy Implications, 31 Fed. Sent.

 R. 256, 257 (2019) (“On average, trial conviction increases the odds of incarceration

 by two to six times and produces sentence lengths that are 20 to 60 percent longer. . . .

 Federal defendants are typically two to three times more likely to go to prison and

 receive incarceration terms from one-sixth to two-thirds longer, even after adjusting
 STATE V. ALEXANDER

 2022-NCSC-26

 Earls, J., concurring in part and dissenting in part

for other relevant sentencing criteria. . . . [T]rial cases are twice as likely to result in

imprisonment, with average sentences that are more than 50 percent longer.”

(citations omitted)); Steven A. Drizin & Richard A. Leo, The Problem of False

Confessions in the Post-DNA World, 82 N.C. L. Rev. 891, 923 (2004) (“At sentencing,

trial judges are conditioned to punish defendants for claiming innocence (the logical

extension of not accepting the prosecutor’s plea bargain and sparing the State the

expense of a jury trial) and for failing to express remorse or apologize for his

wrongdoings.”). Further, there is evidence that defendants who have experienced

trauma or have been victimized themselves may be especially susceptible to pressure

to plead guilty, even believing at the time that they are at fault despite there being

legally cognizable defenses to exonerate them. See Andrew D. Leipold, How the

Pretrial Process Contributes to Wrongful Convictions, 42 Am. Crim. L. Rev. 1123, 1125

n.8 (2005) (“Some defendants fail to assist in their defense or are willing to plead

guilty because they are afraid, because they have no confidence in defense counsel,

because they are trying to spare their loved ones the trauma of trial, or because they

are mentally challenged.”). As Justice Scalia observed, the plea-bargaining system

“presents grave risks of prosecutorial overcharging that effectively compels an

innocent defendant to avoid massive risk by pleading guilty to a lesser offense.” Lafler

v. Cooper, 566 U.S. 156, 185 (2012) (Scalia, J., dissenting). Thus, it should be no

surprise that, for entirely rational and comprehensible reasons, actually innocent
 STATE V. ALEXANDER

 2022-NCSC-26

 Earls, J., concurring in part and dissenting in part

 people plead guilty. See, e.g., Brandon L. Garrett, Convicting the Innocent: Where

 Criminal Prosecutions Go Wrong 150–53 (2011) (noting that of the first 330 DNA

 exonerations, eight percent, or twenty-seven, had pleaded guilty).

¶ 73 Against this backdrop, it is fallacious to contend that allowing a defendant who

 has previously pleaded guilty to assert actual innocence would “make ‘a mockery’ of

 the General Assembly’s postconviction DNA procedure.” Our criminal justice system

 seeks finality, but it makes no pretenses to infallibility. Depriving defendants with

 credible actual innocence claims of an opportunity to demonstrate their innocence on

 the basis of a strained interpretation of a remedial statute is inconsistent with that

 statute and with the values our criminal justice system strives to uphold. Of course,

 the State has an interest in enforcing procedural mechanisms designed to filter out

 frivolous claims in order to promote the efficient administration of justice. But

 ultimately, the point is to administer justice, and there is no justice in consigning an

 actually innocent defendant to a life in prison or worse. To imply that such a

 defendant deserves his fate because he was one of the overwhelming majority of

 criminal defendants who resolve their case through plea bargaining is willfully blind

 to reality and to the problems the General Assembly set out to address in enacting

 N.C.G.S. § 15A-269.

¶ 74 However, while I agree with the majority that defendants who plead guilty are

 not categorically ineligible for postconviction DNA testing under N.C.G.S. § 15A-269,
 STATE V. ALEXANDER

 2022-NCSC-26

 Earls, J., concurring in part and dissenting in part

 I cannot join the majority in its conclusion that this defendant has failed to

 demonstrate materiality within the meaning of the statute. The majority is correct

 that N.C.G.S. § 15A-269(b) requires Alexander to demonstrate “a reasonable

 probability that the verdict would have been more favorable to the defendant” if the

 DNA evidence he seeks had been admitted at a trial. But the majority errs in its

 application of this standard in the present case.

¶ 75 Alexander did not, as the majority suggests, need to “provide sufficient

 evidence that he was not involved in the commission of second-degree murder in order

 to show materiality”—that is, the burden was not on Alexander to exculpate himself

 in order to establish his entitlement to DNA testing. At this stage of proceedings,

 under N.C.G.S. § 15A-269, a court is not deciding whether Alexander is actually

 innocent and should be released. The court is only deciding whether to allow

 postconviction DNA testing. Thus, in assessing materiality, the court considers the

 potential impact of the evidence had the evidence been available at the time

 Alexander entered his guilty plea, and at a subsequent trial where the burden would

 be on the State to prove his guilt beyond a reasonable doubt. If there is a reasonable

 probability that admission of the requested DNA evidence would cause Alexander not

 to plead guilty to second-degree murder and cause a jury not to find Alexander guilty

 of that crime, then he has satisfied his burden of proving materiality, regardless of

 whether or not he has brought forth affirmative evidence of his innocence at this time.
 STATE V. ALEXANDER

 2022-NCSC-26

 Earls, J., concurring in part and dissenting in part

¶ 76 The majority correctly explains that “ ‘[m]ateriality’ as used in the statutory

 provisions governing postconviction DNA testing should be understood in the same

 way that ‘materiality’ is understood in Brady v. Maryland, 373 U.S. 83 (1963), and

 its progeny.” Yet the majority’s application of the materiality standard in this case

 imposes a significantly heavier burden on Alexander than what Brady and its

 progeny require. For example, in Kyles v. Whitley, the United States Supreme Court

 explained that evidence can be material within the meaning of Brady even if it does

 not establish that there is insufficient evidence to sustain a defendant’s conviction.

 514 U.S. 419, 434–35 (1995) (“[M]ateriality . . . is not a sufficiency of evidence test. A

 defendant need not demonstrate that after discounting the inculpatory evidence in

 light of the undisclosed evidence, there would not have been enough left to convict.”).

 A defendant must demonstrate that the evidence creates “[t]he possibility of an

 acquittal on a criminal charge,” not that there is “an insufficient evidentiary basis to

 convict.” Id. at 435. Requiring defendants to prove their innocence at this stage of the

 proceedings is simply inconsistent with the materiality standard the majority

 purports to apply and its purpose, which is to weed out frivolous claims.

¶ 77 Applying the proper materiality standard, I would hold that Alexander has

 demonstrated a reasonable probability that he “would not have pleaded guilty and

 otherwise would not have been found guilty.” State v. Randall, 259 N.C. App. 885,

 887 (2018) (emphasis omitted). In assessing materiality, we assess the impact of the
 STATE V. ALEXANDER

 2022-NCSC-26

 Earls, J., concurring in part and dissenting in part

 DNA evidence “in the context of the entire record.” State v. Lane, 370 N.C. 508, 519

 (2018) (quoting State v. Howard, 334 N.C. 602, 605 (1993)). Here, the “context of the

 entire record” makes clear that the presence of another person’s fingerprints on shell

 casings and a bullet found at the scene of Carl Boyd’s killing is material within the

 meaning of N.C.G.S. § 15A-269.

¶ 78 With respect to Alexander’s guilty plea, a court “is obligated to consider the

 facts surrounding a defendant’s decision to plead guilty in addition to other evidence,

 in the context of the entire record of the case, in order to determine whether the

 evidence is ‘material.’ ” Randall, 259 N.C. App. at 887. In this case, it is salient that

 at the time he pleaded guilty, Alexander was facing the death penalty, had no insight

 into potential weaknesses in the State’s case, had an alibi defense corroborated by

 witness testimony, and was under the impression that he would serve ten years in

 prison if he agreed to the plea bargain being offered. What Alexander lacked at the

 time he entered his plea was any physical evidence tending to detract from the State’s

 theory of the case that he was the shooter. Absent such evidence, the pressure to

 plead guilty rather than face a capital trial was overwhelming, regardless of the

 strength or weakness of the State’s case. With DNA evidence that would, at a

 minimum, provide some evidentiary basis for Alexander’s assertion that someone

 other than him was the shooter, there is a significantly greater chance that he would

 have been willing to forego the plea bargain and take his chances at trial.
 STATE V. ALEXANDER

 2022-NCSC-26

 Earls, J., concurring in part and dissenting in part

 Alternatively, evidence tending to detract from the State’s theory of guilt might have

 caused prosecutors to offer a plea bargain presenting Alexander with more favorable

 terms on less serious charges.

¶ 79 Had Alexander proceeded to trial, DNA evidence demonstrating that another

 person handled shell casings and a projectile found at the crime scene would likely

 have had a significant effect on the jury’s deliberations. See Lane, 370 N.C. at 519

 (“The determination of materiality . . . hinges upon whether the evidence would have

 affected the jury’s deliberations.”). Again, while the presence of third-party DNA on

 the shell casings and projectile would not exclude the possibility that Alexander shot

 Boyd, it could reasonably have caused the jury to doubt the State’s account of how

 Alexander supposedly perpetrated the crime, especially if Alexander’s DNA was also

 not found on the shell casings and projectile. The majority’s rejoinder is that

 Alexander still could have been convicted on an acting in concert theory of guilt “even

 if he had never personally held the weapon from which the fatal shots were fired,”

 but there is at present no evidence in the record indicating that Alexander joined with

 another person “in a purpose to commit a crime.” State v. Barnes, 345 N.C. 184, 233

 (1997) (quoting State v. Erlewine, 328 N.C. 626, 637 (1991)). The State may have

 ultimately been able to negate the impact of the DNA evidence and secure

 Alexander’s conviction for second-degree murder on an acting in concert theory, but

 it should be obvious that physical evidence supporting the inference that someone
 STATE V. ALEXANDER

 2022-NCSC-26

 Earls, J., concurring in part and dissenting in part

 other than Alexander pulled the trigger would be extremely relevant in Alexander’s

 trial for second-degree murder.

¶ 80 The DNA evidence Alexander seeks would, if it shows what he believes it

 shows, provide evidentiary support for the reasonable determination that someone

 other than Alexander was the shooter. The evidence would not conclusively establish

 Alexander’s innocence, but that is not the burden he must carry at this stage. Instead,

 he must only demonstrate that with the DNA evidence he seeks there would have

 been a reasonable probability that he would not have pleaded guilty to second-degree

 murder and would not have been convicted of the same had he proceeded to trial.

 Here, given that the State’s case was not overwhelming, DNA testing “could

 reasonably be taken to put the whole case in such a different light as to undermine

 confidence in the verdict.” Kyles, 514 U.S. at 419. Accordingly, while I agree with the

 majority that Alexander and all defendants who plead guilty are eligible to seek DNA

 testing under N.C.G.S. § 15A-269, I would hold that evidence which could support the

 inference that a defendant convicted of second-degree murder was not the shooter is

 material within the meaning of that statute. Accordingly, I respectfully concur in part

 and dissent in part.